**TEXAS FARMERS INSURANCE COMPANY**

v.

**Richard R. SORIANO and Auforth, Keas, & O'Reilly.**

No. 04–90–00222–CV.

Court of Appeals of Texas, San Antonio.

Nov. 30, 1992.

Rehearing Denied Jan. 20, 1993.

Roger Townsend, Ben Taylor, Fulbright & Jaworski, Houston, W. Wendell Hall, Fulbright & Jaworski, San Antonio, for appellant.

Raymond C. Alexander, Tom C. Hermansen, Hunt, Hermansen, McKibben & Barger, Corpus Christi, Ronald B. Brin, Thomas F. Nye, Lynette Maniss Frederick, Alan J. Couture, Brin & Brin, P.C., Corpus Christi, for appellees.

David E. Chamberlain, Lea & Chamberlain, Austin, amicus curiae.

## ON APPELLANT'S AND APPELLEES' MOTIONS FOR REHEARING AND ON APPELLEES' MOTION FOR REHEARING EN BANC

CHAPA, Justice.

The motion for rehearing en banc is granted, the opinion of this court dated July 22, 1992 is withdrawn, and the following opinion is substituted therefore.

Richard R. Soriano sued Texas Farmers Insurance Company[1] in Duval County alleging negligence, breach of the duty of good faith and fair dealing, and gross negligence based on several lawsuits wherein Farmers defended Soriano's interests pursuant to an insurance policy. Farmers sought contribution or indemnity from the law firm of Auforth, Keas & O'Reilly, which had represented Soriano in the underlying lawsuits. Based on a jury verdict, the trial judge rendered judgment against Farmers for $520,577.24 in actual damages and prejudgment interest, plus $5,000,000 in exemplary damages. The trial court also ordered a take nothing judgment on Farmers' third party action against Auforth, Keas & O'Reilly.

### Facts.

In September of 1979, Richard Soriano and his friend Adolfo Lopez were celebrating following a football game in Duval County. After apparently considerable drinking, Soriano and his passenger, Adolfo Lopez, were involved in a car accident. Just prior to the accident, Soriano tried to pass a truck in rainy weather, and collided head on with another vehicle.[2] Soriano's passenger, Adolfo Lopez, was fatally injured.

The occupants of the oncoming vehicle, which was driven by Mr. Medina, also sustained severe injuries. Mr. Medina suffered serious injuries including broken ribs, a broken jaw, broken feet, and severe head lacerations, while his wife of thirty years was killed in the accident. Additionally, the Medinas' eleven-year-old son sustained three broken teeth, and their twelve-year-old daughter suffered a broken collar bone and facial cuts resulting in permanent scars.

Soriano was insured under his parents' policy with Farmers, which, apparently, consisted of only minimum coverage. Any one injury had limits of $10,000, with the aggregate not to exceed $20,000. Farmers set up tentative reserves of $9,000 for Mr. Medina, $9,000 for the estate of Mrs. Medina, and $1,000 for each of the Medinas' two children.[3] Farmers initially attempted to settle the entire case directly with the Medinas by tendering the entire policy limits of $20,000; however, the Medinas refused the offer at that time and, instead, hired an attorney in order to discover whether or not Soriano possessed any personal assets. Subsequently, the parents of Adolfo Lopez also hired an attorney and filed suit. Farmers hired Fred Auforth to defend Soriano in both lawsuits in compliance with Farmers' duties under the insurance policy.

The two lawsuits were consolidated for trial. As the jury was being selected, Auforth, on behalf of Farmers, settled the Lopez claim for $5,000 without prior notice to the Medinas. Huseman, the Medinas' attorney, testified that he told Auforth that he was willing to settle all of the Medinas' claims for the $20,000 prior to the Lopez settlement, and that none of the Medina claims would be settled for less than the $20,000 originally offered. Farmers asserts that after it settled the Lopez claim, it offered the remaining $15,000 of insurance to the Medinas, who refused the offer and demanded the full original policy limits of $20,000.

The case went to trial and the Medinas recovered a judgment of $172,187 plus interest against Soriano. Soriano then as-

1. Hereinafter "Farmers."

2. Soriano was subsequently charged with involuntary manslaughter, passing with insufficient clearance, driving at an unsafe speed, and driving while under the influence of alcohol.

3. An additional $1,000 was later reserved for Mr. Lopez, which clearly exceeded the policy limits in force at that time.

signed whatever rights he had against Farmers in exchange for a covenant not to execute.[4] Suit was then filed in Richard Soriano's name against Farmers, wherein various causes of action were alleged, including negligence, gross negligence, and breach of the duty of good faith and fair dealing. A jury subsequently found that Farmers was negligent and grossly negligent in handling the Medina claims and that it had breached its duty of good faith and fair dealing to Soriano.

Appellant raises the following points of error:

1. the trial court erred in denying appellant's objections to the charge and in rendering judgment against the appellant because there is no evidence or finding that the Lopez settlement was unreasonable, negligent, or made in bad faith;

2. the trial court erred in denying appellant's Motion for Instructed Verdict, appellant's objections to the charge, in rendering judgment against the appellant, and in overruling appellant's Motions to Disregard Jury Findings and for Judgment Notwithstanding the Verdict because the evidence is legally and factually insufficient to support findings of negligence, gross negligence, proximate cause, and breach of the duty of good faith and fair dealing;

3. the trial court erred in overruling appellant's objections to submission of Special Issue No. 1 because it was unsupported by any written pleading, contrary to the theory the case was tried upon, and calculated to nudge the jury toward its insupportable finding of negligence;

4. the trial court erred in overruling appellant's objections to the instruction submitted under Special Issue No. 3 because it was unsupported by any written pleading and was calculated to confuse the jury into making its insupportable bad faith finding;

5. the trial court erred in overruling appellant's objections to the instruction submitted under Special Issue No. 9 because it erroneously instructed the jury to include, as damages, the full amount of the Webb County judgment, thereby depriving the jury of discretion to award a lesser amount or zero;

6. the trial court erred in rendering judgment against the appellant, in overruling appellant's Motion to Disregard Jury Findings and in overruling appellant's Motion for New Trial or for suggestion of remittitur because the evidence is legally and factually insufficient to support the finding of actual damages;

7. the trial court erred in denying appellant's objections to the charge, in rendering judgment against the appellant, and in overruling appellant's Motion for Judgment Notwithstanding the Verdict because there is no finding and insufficient evidence that any vice principal of the appellant committed conduct for which exemplary damages may be awarded and, alternatively, the answer to Special Issue No. 6 conflicts with the liability findings against the appellant, in which case the trial court erred in overruling appellant's Motion for New Trial;

8. the trial court erred in rendering judgment against the appellant and in overruling appellant's Motion to Disregard Jury Findings, Motion for Judgment Notwithstanding the Verdict and Motion for New Trial because Special Issue No. 4, that the appellant acted intentionally and knowingly, is not supported, either legally or factually, by the evidence;

9. the trial court erred in rendering judgment against the appellant, and in overruling appellant's Motion to Disregard Jury Findings, Motion for Judgment Notwithstanding the Verdict, and Motion for New Trial or for suggestion of remittitur because the evidence is legally and factually insufficient to support the excessive award of $5,000,000 in exemplary damages and further, the exemplary damages awarded violated appellant's right to due process and equal protection under the Texas and federal constitutions, as well as the prohibition against excessive fines contained in Tex. Const. art. I, § 13; and,

---

4. The Medinas also agreed not to press the pending criminal charges against Soriano.

10. the trial court erred in overruling appellant's Motion to Modify, Correct, or Reform the Judgment because the judgment awards excessive and duplicative interest.

Initially, appellant contends that the trial court erred in denying appellant's objections to the charge and in rendering judgment against it because there is no evidence or finding that the Lopez settlement was unreasonable, negligent, or made in bad faith.

We immediately note that most, if not all, of appellant's points of error are improperly multifarious. *Kroger Co. v. Cellan,* 560 S.W.2d 505, 507 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.); TEX.R.APP.P. 74. We will, nevertheless, address the issues as we understand them.

Appellant is required to present this court with a record which establishes the error complained of and with a brief which clearly defines the points of error, cites proper authority, and directs the attention of this court to the record where the error is properly preserved. TEX.R.APP.P. 50, 74.

In order to preserve error, "[a] party objecting to a charge must point out distinctly the matter to which he objects and the grounds of his objection." *Aero Energy, Inc. v. Circle C Drilling Co.,* 699 S.W.2d 821, 822 (Tex.1985), citing TEX. R.CIV.P. 274. "A party is [also] confined to grounds of objection stated in the trial court, and will not be able to enlarge his complaint on appeal"; when violated, an "[a]ppellant has waived any complaint regarding the wording of [the] Special Issue [complained of]." *Williams v. Union Carbide Corp.,* 734 S.W.2d 699, 703 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

■ A review of that part of the record cited by appellant for support in accordance with TEX.R.APP.P. 74 reveals that the appellant has improperly enlarged his complaint on appeal. *Id.* Before the court

below, appellant clearly directed its objections to Special Issue No. 1 from the standpoint of whether "the offer of settlement of the Maria Medina death claim and Carlos Medina's personal injury claim were conditional offers," and in the alternative, appellant requested an "instruction in that regard." In fact, appellant specifically advised the court that it would later submit written requests for an issue or an instruction covering the said objection prior to the charge being read to the jury. In this respect, the transcript reveals the following issue and instruction were later requested in writing by the appellant and denied by the court:

SPECIAL ISSUE NO.

Do you find from preponderance of the evidence that the offer of settlement of the Maria Medina death claim and the Carlos Medina personal injury claim were conditional offers.

A conditional offer to settle a claim arises when the settlement of that claim depends upon the settlement of another claim or condition.

INSTRUCTION NO.

You are instructed that an insurance company cannot be liable for refusing an offer of settlement if that offer is conditional.

A conditional offer to settle a claim arises when the settlement of that claim depends upon the settlement of another claim or condition.

Thus, the record clearly reflects that the appellant has waived the complaint by improperly "enlarg[ing] his complaint on appeal." *Williams,* 734 S.W.2d at 703.

Nevertheless, embracing what appears to be unassigned error, the dissent would reverse and render. Without citing to any Texas authority, the dissent attempts to create a completely new standard of review for multiple claim cases, and ignores time honored standards of review in attacking the charge.[5] Additionally, although the ap-

---

5. While I do not quarrel with some of my colleagues' suggestion that the time may have come for the Texas Supreme Court to look at "Comparative Bad Faith," the fact remains that a trial court cannot be reversed unless it has committed reversible error. There is no dispute that a "Comparative Bad Faith" Doctrine does not now exist in Texas law, nor was the trial court in this case requested to submit a charge with such issues or instructions by any of the parties.

pellant simply relies on a contention that "[a]s a matter of law, Soriano's failure to obtain a finding that the Lopez settlement was negligent or in bad faith invalidates his entire lawsuit," the dissent goes further and embraces unassigned error in concluding "that because there is no evidence and no finding by the jury that the Lopez settlement was unreasonable and in bad faith, *when viewed by itself,* there is no proof of a cause of action." (Emphasis added.)

Although the duty herein involved is only the duty voluntarily assumed by the carrier to the insured under the policy, the dissent repeatedly attempts to make the insured the culprit for being underinsured. However, while we recognize that the insured's negligence caused the accident, the issue here is not whether the insured should be penalized for being underinsured, but simply whether the carrier breached its duty under the policy. Further, this insurer, who drafted this policy, was not forced to issue this policy to this insured, or to assume the duties therein imposed upon itself. Moreover, under Texas law, it "is a fundamental rule that the writing will be construed most strictly against the party who drafted it," and that language in an insurance "policy must be construed strictly against the insurer and liberally in favor of the insured." *Foremost County Mut. Ins. Co. v. Home Indem. Co.,* 897 F.2d 754, 759 (5th Cir.1990); *see also Barnett v. Aetna LIfe Ins. Co.,* 723 S.W.2d 663, 666 (Tex. 1987); *Ellis v. Mortgage & Trust, Inc.,* 751 S.W.2d 721, 723 (Tex.App.—Fort Worth 1988, no writ). Moreover, if the dissent is correct, breach of bad faith and fair dealing causes of actions would be effectively eliminated in multiple claim cases because the burden on any insured claiming such a breach by an insurer would be insurmountable. The duty in such a cause of action is the duty of the carrier to protect its insured. In this case, the cause of action would arise upon an alleged breach of such a duty owed to Soriano.

The dissent would require an insured in a multiple claim case to plead and raise fact issues that any settlement made by the insured when "viewed by itself" was unreasonable without considering any other unsettled claims. This would undoubtedly result in summary judgments as a matter of course. In a situation involving two or more claims where the carrier settles one, the insured would be subject to summary judgment unless he could plead and raise fact issues of breach of good faith and fair dealings *considering only a claim settled "viewed by itself,"* without regard for the other unsettled claims. This would necessarily mean that any evidence surrounding either the relationship between the insured and carrier or any other unsettled claims would become irrelevant, regardless of the disastrous consequences to the insured.

Considering that the heart of the cause of action is the contention by the insured that his insurer's breach of good faith and fair dealings caused him harm at the hands of a claimant with whom the insurer has *not* settled, the result would be that the vast majority of the evidence the insured would normally rely upon to establish his claim would be irrelevant and inadmissible. Moreover, every claimant is required to establish some damage in any cause of action. The insured in such cases would be precluded from establishing any damage since his damages would normally be at the hands of an *unsettled* with claimant, which could not be considered under the standard advocated by the dissent. This would effectively relieve the insurer of any responsibility whatsoever to protect an insured in a case of multiple claims, as long as the insurer would pay one of the multiple claimants a sum which could be considered reasonable when considered alone. In fact, under the dissent's logic, the insurer would simply be required to pay the entire amount of the coverage to the claimant with the most insignificant claim. Having done so, the insurer would be relieved of any further obligation to the insured, since it would be simple to show how reasonable payment of the entire coverage in settlement of the insignificant claim was, considering that claim *by itself,* without considering all the other claims.

Therefore, how has the trial court committed reversible error?

■ If an insured is to receive the protection the insurer has imposed upon itself under the policy, he must have the right to have a jury determine the ultimate question of whether the carrier breached the duty of good faith and fair dealings from the totality of the circumstances surrounding the occurrence. This would necessarily include the relationship between the insured and carrier and all claims arising from the incident.

On the other hand, if the thrust of the dissent is directed to the court's charge, the limiting instruction it suggests must refer to Special Issue No. 3, which is the critical issue regarding the breach of good faith and fair dealing cause of action. The issue was answered by the jury as follows:

SPECIAL ISSUE NO. 3:

Did Texas Farmers Insurance Co. breach the duty of good faith and fair dealing in the business of insurance with its insured, Richard R. Soriano, and was such breach, if any, a proximate cause of the excess Judgment against Richard R. Soriano in Webb County, Texas?

You are instructed that such breach occurs when there is no reasonable basis for a failure to pay a settlement demand or delay in payment or if there is a failure on the part of an insurance company to determine whether there is any reasonable basis for the failure to settle or delay.

Answer "Yes" or "No" by marking in the appropriate column.

YES    NO
 yes    ____

If this is the case, the 1) no evidence, 2) waiver, and 3) abuse of discretion standards of review are necessarily implicated. We hold that the appellant has failed in its burden under any or all of the applicable standards of review.

■ In considering a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522

(Tex.1988); *Garza v. Alviar*, 395 S.W.2d 821, 824 (Tex.1965). Further, reasonable "[i]nferences may be drawn [by the trier of the facts] from actual facts proved." *Beazley v. McEver*, 238 S.W. 949, 952 (Tex. Civ.App.—Dallas 1922, no writ).

■ The record in the present case reflects the following evidence and reasonable inferences that the jury could believe: it was appellant's duty to offer Soriano the full extent of protection available under his insurance policy; there was no question that the limits of the policy were inadequate under the particular facts; it was conceded that of all the injuries sustained as a result of the accident, those received by Mr. Medina and Mrs. Medina were the most severe and, in fact, substantially exceeded the value of the entire policy coverage and the Lopez claim; the appellant was made clearly aware prior to the Lopez settlement that the Lopez family and the Soriano family were friends, and that it was very probable that the Lopez family had no intention of pursuing the lawsuit against the Sorianos; the Lopez claim was worth considerably less than the Medinas' claims, especially in view of the fact that Lopez was an adult child[6] and had been drinking along with Soriano just prior to the accident; prior to the Lopez settlement, the appellant was clearly aware that the Medinas would not settle any of their four claims for less than the $20,000 that had originally been offered to them; the appellant had originally reserved the entire policy limits for the Medina family and, in fact, offered the Medina family the policy limits; that despite the recommendations of its attorney, the appellant refused to place the policy limits into the registry of the court, and instead, instructed its attorney to do nothing after filing the answer; and, appellant was advised by the Medina attorney that the Medinas were willing to settle their entire claim for the policy limits prior to the Lopez settlement.

Consequently, considering only the assigned error as presented by the appellant,

6. At the time this accident occurred, the law precluded a family from recovering for the loss

of society and love under the particular facts involved.

818

we cannot agree that there is no evidence that the Lopez settlement was unreasonable, negligent, or made in bad faith when viewed from the totality of the surrounding circumstances.

Although the dissent concedes that normal application of the no evidence standard of review to these facts would require affirming the jury findings, it suggests that the charge should have limited the jury's consideration of the good faith and fair dealing issue to whether "the Lopez settlement was unreasonable and in bad faith, *when viewed by itself.*" (Emphasis added.) Therefore, the 1) waiver and 2) abuse of discretion standards of review as they relate to an objection to the charge are brought into focus.

■ Texas Rule of Civil Procedure 277 provides that "[i]n all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions. The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict." Thus, the trial court has wide discretion in determining the proper issues and instructions to be submitted to the jury, *Mobil Chem. Co. v. Bell,* 517 S.W.2d 245, 255 (Tex.1974); *Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554, 557 (Tex.1972), and broad issues are the preferred manner of submission in negligence cases. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n,* 710 S.W.2d 551, 554 (Tex.1986); *Lemos v. Montez,* 680 S.W.2d 798, 801 (Tex.1984). Simplicity in the jury charge must be an overriding concern. *Lemos,* 680 S.W.2d at 801. A charge is erroneous when it confuses and misleads the jury. *H.E. Butt Grocery Co. v. Johnson,* 226 S.W.2d 501, 504 (Tex.Civ. App.—San Antonio 1949, writ ref'd n.r.e.). "A judgment should not be reversed because of the failure to submit other and various phases or different shades of the same question." *Sheldon L. Pollack Corp. v. Falcon Indus., Inc.,* 794 S.W.2d 380, 383 (Tex.App.—Corpus Christi 1990, writ denied); *Granado v. Madsen,* 729 S.W.2d 866 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.); TEX.R.CIV.P. 278. Clearly, the court here correctly sub-

mitted a valid broad issue to the jury as required by TEX.R.CIV.P. 277.

■ Further, it is the duty "of the trial court in submitting issues to the jury: First, to submit all the controverted fact issues made by the pleadings; second, to submit each issue distinctly and separately, avoiding all intermingling; and, third, to give such explanation and definition of legal terms as shall be necessary to enable the jury to answer each issue." *Texas & Pac. Ry. Co. v. Davis,* 374 S.W.2d 305, 310 (Tex.Civ.App.—El Paso 1963, writ ref'd n.r.e.); TEX.R.CIV.P. 271, 272, 273. Therefore, what explanations and definitions of legal terms may be necessary to enable the jury to answer each issue is within the sound discretion of the court. Consequently, reversal will not lie because of an instruction being included or refused, in the absence of a showing of a clear abuse of discretion. "In a closely contested ... case it is error to burden the jury with excess instructions which emphasize extraneous factors to be considered in reaching a verdict," and the error is harmful when it becomes "a comment on the weight of the evidence and the case as a whole." *First Int'l Bank in San Antonio v. Roper Corp.,* 686 S.W.2d 602, 605 (Tex.1985); *Acord v. General Motors Corp.,* 669 S.W.2d 111, 116 (Tex.1984).

■ In addition to making a proper objection, an appellant must submit a substantially correct definition or instruction in writing to the trial court prior to the case being submitted to the jury. *Templeton v. Unigard Sec. Ins. Co.,* 550 S.W.2d 267, 269 (Tex.1976); TEX.R.CIV.P. 273. A substantially correct instruction is "one that in substance and in the main is correct." *Placencio v. Allied Indus. Int'l, Inc.,* 724 S.W.2d 20, 21 (Tex.1987). It has also been held that a requested instruction is substantially correct if it can be properly submitted as worded. *Yellow Cab Co. v. Smith,* 381 S.W.2d 197, 198 (Tex.Civ. App.—Waco 1964, writ ref'd n.r.e.).

■ However, a review of this record reflects that appellant failed to submit any written requested instructions to the trial court limiting the jury's consideration as

suggested by the dissent. *Templeton,* 550 S.W.2d at 269. The record further reflects that the appellant also failed to make the same objection to the trial court below in this regard that he now makes on appeal, and thus, waived this complaint. *Aero Energy, Inc.,* 699 S.W.2d at 822.

We have attempted to follow the same Texas laws and appellate procedures which have served the Texas citizens for many years. However, the dissent would change and add to an insured's burdens, reduce the legal duties imposed upon an insurer by its own insurance policy, change this state's standards of review, consider unassigned error, revise this state's appellate procedures, and all after the case has been tried below. This court certainly does not have the authority to make all these changes. Indeed, it would be unfair, unjust, and untenable for any appellate court to change all the rules in the middle of the game, after the case has been fully tried in accordance with all the existing and time tested rules, even if it had the power to do so. Appellant's point of error is overruled.

Appellant next argues that the court committed reversible error in denying appellant's Motion for Instructed Verdict, appellant's objections to the charge, in rendering judgment against the appellant, and in overruling appellant's Motions to Disregard Jury Findings and for Judgment Notwithstanding the Verdict because the evidence is legally and factually insufficient to support findings of negligence, proximate cause, gross negligence, and breach of the duty of good faith and fair dealing.

█ Generally, when reviewing factual insufficiency contentions, "we must consider and weigh all of the evidence, including any evidence contrary to the trial court's judgment." *Burnett v. Motyka,* 610 S.W.2d 735, 736 (Tex.1980). We may not substitute our conclusions for that of the trier of fact, *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986), nor may we pass on the credibility of the witnesses or the weight to be given their testimony. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792 (1951). We may not interfere with the trier of fact's resolution of conflicts in the

evidence. *Id.* 239 S.W.2d at 792. Further, reasonable "[i]nferences may be drawn [by the trier of the facts] from actual facts proved." *Beazley,* 238 S.W. at 952. Thus, if there is competent evidence of probative force which supports the facts in issue, the findings of the trier of fact will be sustained unless we find the evidence insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool,* 715 S.W.2d at 635; *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (great weight and preponderance); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

"In determining that there is 'no evidence' to support a jury finding, the court must consider the evidence in the light most favorable to the finding, considering only the evidence and inferences which support the finding, and rejecting the evidence and inferences contrary to the finding." *Campbell v. Northwestern Nat'l Life Ins. Co.,* 573 S.W.2d 496, 497 (Tex.1978); *De Alonzo v. Solis,* 709 S.W.2d 690, 692 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.).

In the present case, Special Issue No. 1 inquired whether the appellant was negligent in the manner in which it handled the claims asserted for the death of Maria Medina and the injuries to Carlos Medina against its insured, Richard R. Soriano, and whether such negligence, if any, was a proximate cause of the excess judgment in Webb County, Texas, against Richard R. Soriano. The jury answered affirmatively. In view of the previously recited facts, we cannot say that the evidence is legally or factually insufficient to support the jury findings.

In response to Special Issue No. 2, which inquired whether "such conduct [was] gross negligence," the jury likewise answered affirmatively.

In *Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981), the Texas Supreme Court defined gross negligence as "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons affected by it." *Id.* at 920. The

court stated that "[t]he jury is not simplistically instructed that it must find an 'entire want of care,' but '*such* an entire want of care as ... shows the act or omission was the result of conscious indifference.'" *Id.* at 922 (emphasis in original). The court continued:

> What lifts *ordinary* negligence into *gross* negligence is the mental attitude of the defendant.... The plaintiff must show that the defendant was consciously, i.e., knowingly, indifferent to his rights, welfare and safety. In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care. *Such conduct can be active or passive in nature.*

*Id.* at 922 (emphasis added).

Moreover, in *Burk Royalty Co.*, the court established standards for appellate review of a jury's gross negligence finding. The court stated:

> In determining whether there is some evidence of the jury's finding of gross negligence, the reviewing court must look to all of the surrounding facts, circumstances, and conditions, not just individual elements or facts.
>
> ....
>
> All actions or circumstances indicating a state of mind amounting to conscious indifference must be examined in deciding if there is some evidence of gross negligence.

*Id.*

Indeed, the exact definition espoused by the court in *Burk Royalty Co.* was employed by the court in the present jury charge. In addition to the facts previously enumerated, the record reflects the following evidence and reasonable inferences which the jury could believe: that several experienced attorneys, including the Medinas' attorney, testified that the actions of the appellant indicated conscious indifference and amounted to gross negligence; Huseman, the Medinas' attorney, further

testified that he advised the appellant through its attorney that the Medinas were willing to settle all of their claims for $20,000, prior to the Lopez settlement; that appellant failed to notify Medina's attorney prior to settling the Lopez case, although appellant admitted that would have been the appropriate thing to do; that the appellant was aware that the Lopez family and the Soriano family were friends and that the Lopez family in all probability would not pursue the lawsuit; that the appellant knew when it settled the Lopez claim that its insured, Soriano, did not have adequate insurance under the circumstances and that Soriano faced great peril primarily from the Medina claims; that although the appellant knew that its insured would be personally liable for any amount in excess of the policy limits, the appellant, nevertheless, acted in such a manner as to expose its insured to a greater degree of liability from the Medinas' claims; and, that appellant's designated representative and claims manager, Philip Jackson, testified that even if a jury found appellant guilty of gross negligence and assessed punitive damages in the sum of six million dollars, appellant would nevertheless thereafter handle such a claim "exactly the same way."

Thus, the jury could have believed that the appellant "knew about the peril, but [its] acts or omissions demonstrated that [it] didn't care." *Burk Royalty Co.*, 616 S.W.2d at 922. In light of these facts, we cannot say that the evidence is legally or factually insufficient to support the jury's finding of negligence, proximate cause, gross negligence, and breach of the duty of good faith and fair dealing.[7] Appellant's point is refused.

Appellant further complains that the court erred in overruling its objections to submission of Special Issue No. 1 because it was unsupported by any written pleading, contrary to the theory the case was

---

7. While I sympathize with the concerns expressed by the concurring and dissenting opinions, we must apply the existing standards of review without regard to what we individually might desire the ultimate result to be. Whether we individually or collectively would have reached a different verdict than that of the jury is a question that must be considered to be entirely irrelevant to the process of appellate review.

tried upon, and calculated to nudge the jury toward its insupportable finding of negligence.

Special Issue No. 1 inquired whether the appellant was negligent in the manner in which it handled the claim asserted for the death of Mrs. Medina and the injuries to Mr. Medina, and whether such negligence was a proximate cause of the excess judgment. As heretofore indicated in the discussion of appellant's initial point of error, appellant has waived any complaint as to the charge by expanding on appeal its objection below. *Williams*, 734 S.W.2d at 703.

Further, Plaintiff's Sixth Amended Original Petition states the following:

Farmers was derelict in its defense of Plaintiff and was specifically guilty or [sic] ordinary and gross negligence, such negligence including, but not limited to, the following:

1. In failing to settle the claim made against Plaintiff Soriano in such a way as to reduce the maximum potential exposure.

2. In failing to obtain maximum benefits from the insurance available to Plaintiff.

3. In the handling of the claims against Richard Soriano.

No special exceptions were filed in response to this pleading; therefore, the petition must be liberally construed in favor of Soriano. *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex.1982); TEX. R.CIV.P. 45. A liberal construction of the petition in the present case supports the submission of Special Issue No. 1. *Id.* at 809. Moreover, this negligence issue was clearly not contrary to the theory upon which the case was tried.

Finally, appellant asserts that this issue "nudged" the jury toward its insupportable finding of negligence. Nevertheless, the standard of review in determining whether or not a jury question improperly persuaded the jury by virtue of an incidental comment on the weight of the evidence is whether the court abused its discretion. *Department of Human Serv. v. E.B.*, 802 S.W.2d 647 (Tex.1990).

The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–43 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *Smithson v. Cessna Aircraft Co.*, 665 S.W.2d 439, 443 (Tex.1984). Rather, a trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Downer*, 701 S.W.2d at 241–43; *Cessna Aircraft Co.*, 665 S.W.2d at 443; *Bush v. Vela*, 535 S.W.2d 803, 805 (Tex.Civ.App.—Corpus Christi 1976, no writ); *King v. Guerra*, 1 S.W.2d 373, 376 (Tex.Civ.App.—San Antonio 1927, writ ref'd). In ascertaining whether the trial court abused its discretion, the reviewing court must determine if the trial court acted without reference to any guiding rules and principles. *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 298 (Tex.1986).

In view of the guiding principle that requires that broad form questions be used when feasible and the totality of the circumstances, we fail to see, and the appellant has failed to point out or establish, how the trial court abused its discretion in submitting Special Issue No. 1. Appellant's point is rejected.

Appellant also argues that the court erred in overruling appellant's objections to the instruction submitted under Special Issue No. 3 because it was unsupported by any written pleading and was calculated to confuse the jury into making its insupportable bad faith finding.

Special Issue No. 3, previously set out verbatim, inquired whether appellant breached its duty of good faith and fair dealing in the business of insurance with its insured, Soriano, and whether such a breach was a proximate cause of the excess judgment entered against him.

Plaintiff's Sixth Amended Original Petition states:

Richard Soriano was an omnibus insured under the contract of insurance which

Texas Farmers Insurance Company wrote and for which it collected premiums and out of such contract, there arose a duty on the part of Defendant to deal fairly and in good faith with Richard Soriano. In this connection, Plaintiff pleads that there was no reasonable basis for denial of the claims arising out of the accident in question which it could have settled within policy limits but did not settle and no reasonable basis for the delay in payment of same and there was a failure on the part of Texas Farmers Insurance Company to determine whether there was any reasonable basis for such denial and/or delay. Such knowing and conscious denial and delay constituted a breach by Defendant of its duty of good faith and fair dealing, proximately causing Plaintiff's damages as set forth hereinafter and giving rise to exemplary damages as set forth hereinafter.

As no special exceptions were filed, we must liberally construe the pleadings. *Roark*, 633 S.W.2d at 809. Upon doing so, we find that the pleadings do support the issue submitted. Moreover, the appellant has failed once again to show an abuse of discretion by the trial judge in submitting this issue. *Department of Human Serv. v. E.B.*, 802 S.W.2d 647 (Tex.1990). Accordingly, we overrule this point as well.

■ In appellant's next point of error, appellant contends that the court committed reversible error in overruling appellant's objections to the instruction submitted under Special Issue No. 9 because it erroneously instructed the jury to include as damages the full amount of the Webb County judgment, thereby depriving the jury of discretion to award a lesser amount of zero.[8]

Specifically, appellant contends on appeal that "neither the law nor this record sup-

port an award of actual damages to Soriano" because "when: (1) the insurer provides a defense to its insured; and (2) the third party claimant agrees not to execute against the insured," and thus "there is no injury to the insured as a matter of law. *Foremost*, 897 F.2d 754."

As previously stated, in order to preserve error, "[a] party objecting to a charge must point out *distinctly* the matter to which he objects and the *grounds* of his objection." *Aero Energy, Inc.*, 699 S.W.2d at 822 (emphasis added); TEX.R.CIV.P. 274.

Further, under TEX.R.CIV.P. 273, an appellant must also present for a trial court's ruling, a substantially correct request for question, definition, or instruction prior to the case being submitted to the jury, separate and apart from the objections to the charge. *Templeton*, 550 S.W.2d at 269; TEX.R.CIV.P. 273. "Violation of Rule 273 precludes appellate review of the request for a special issue and the request for an instruction to the jury." *Id.* "A party is confined to the grounds of objection stated in the trial court, and will not be able to enlarge his complaint on appeal." *Williams*, 734 S.W.2d at 703; *Perez v. Baker Packers*, 694 S.W.2d 138, 141–42 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.).

A review of the record to which appellant directs this court, fails to disclose that 1) any agreement involving an alleged covenant not to execute was ever introduced into evidence and, it is therefore not before this court; and 2) a *distinct objection on the grounds now asserted on appeal* was ever presented for the trial court's consideration and ruling as required by TEX. R.CIV.P. 274, which presents nothing for review. *Aero Energy, Inc.*, 699 S.W.2d at 822. In fact, the record reflects not only

---

**8.** Specifically, Special Issue No. 9 stated:
   What sum of money if now paid in cash would fairly and reasonably compensate Richard R. Soriano for his damages by reason of the trial in Webb County, Texas and the resulting excess judgment?
   Take into consideration the following elements of damages and none other.
   The difference between the excess judgment taken against Richard R. Soriano with interest

to date, and the amount paid by Texas Farmers Insurance Co. toward satisfaction of such judgment.
Answer in dollars and cents, if any.
ANSWER: $ 235,479.13
Mental anguish in the past.
Answer in dollars and cents, if any.
ANSWER: $ 0

that no agreement involving an alleged covenant not to execute was ever introduced into evidence, but that the trial court was never presented with any argument involving an agreement with an alleged covenant not to execute either by objections to the charge, or pursuant to the subsequent post trial motions. Moreover, no written issue, definition, or instruction was ever presented to the trial court involving any agreement with an alleged covenant not to execute as required by TEX.R.CIV.P. 273, which presents nothing to review as to a failure to instruct. *Templeton*, 550 S.W.2d at 269.

Although the dissent concedes that no agreement involving a covenant not to execute was ever introduced in trial,[9] and that the trial court was never specifically apprised by the appellant that the alleged agreement with a covenant not to execute was a ground for any objection to the instruction or any subsequent relief sought, the dissent nevertheless insists in making this phantom agreement a cornerstone of its demand for a reversal and rendition of this judgment.

The dissent insists that this appellant has satisfied its burden on appeal pertaining to all the provisions of the alleged agreement by simply eliciting a "correct" answer from Soriano to an inquiry as to whether, as a result of an assignment [not introduced], Soriano "didn't have to worry about having to pay that judgment off any more." First, Soriano was not shown to have any legal expertise or ability to interpret any contract; second, even a legal expert could not furnish all the provisions of a contract with such a simple answer; and third, if Soriano was appealing and attempted to satisfy his burden pertaining to the provisions of such an agreement with the same simple answer without introducing the instrument which speaks for itself, it would certainly likewise be insufficient.

The dissent stretches the rules drastically, insisting that the following objection to the charge sufficiently preserves the error asserted for the first time on appeal:

Defendant objects to special issue number 9 because the inquiry therein instructs the jury to award damages resulting from an excess judgment. The jury is not given the discretion of awarding an amount less than the excess judgment or zero.

■ Clearly, the purpose of rules 273 and 274 is to prevent the ambushing of a trial judge with vague and indefinite objections and grounds so that the trial court can have a fair opportunity to correct any possible error at trial, thus preventing unnecessary appeals. TEX.R.CIV.P. 273, 274. However, in order to accomplish this, the trial court must not only be *distinctly* apprised of what the objection is, but also of the *distinct* grounds upon which the objection is based, since no objection should be sustained without proper grounds.

While the trial court here may have been made aware by this objection that the appellant was objecting to the jury instruction, this objection cannot be considered to be *distinct* as to the grounds now asserted on appeal for the first time, especially considering that the alleged agreement was never introduced into evidence and was never asserted as grounds at any other time. This ground is clearly asserted on appeal for the first time, and as an enlargement of appellant's objections below, should not be grounds for appellate relief. Surely, if the appellant really intended to assert this ground before the trial court, it should be required to at least give the trial judge some sort of glimpse of it by either introducing the instrument, or specifically asserting it at some point in the trial. Playing hide and seek with the trial court

**9.** The dissenting author refers to his dissent in *Garcia v. American Physicians Ins. Exchange*, 812 S.W.2d 25 (Tex.App.—San Antonio 1991, writ granted), as authority for his insistence on reversing and rendering on this point. However, we note that in that case, the present author made it clear that the provisions of the agreement involving any covenant not to execute were critical, pointing out that different results

would be proper depending on the wording of the agreement. *Id.* at 42 n. 9. Moreover, in this case, not only did the appellant fail to properly preserve error, but he also failed to introduce the agreement so that the agreement would be properly before us, and could be scrutinized in the same manner that the dissent scrutinized the agreement in *Garcia*. Therefore, the reliance is misplaced.

should not be condoned, and the dissent stretches the rules in its efforts to justify reversing and rendering.[10] Therefore, appellant will be "confined to the grounds of objection stated in the trial court, and will not be able to enlarge his complaint on appeal." *Williams*, 734 S.W.2d at 703; *Perez*, 694 S.W.2d at 141–42. Furthermore, in addition to failing to properly preserve this point of error, appellant misplaces its reliance entirely on *Foremost County Mut. Ins. Co.*, 897 F.2d at 759, to sustain its position.

In *Foremost County Mut. Ins. Co.*, claimant Porcayos obtained a judgment in excess of the coverage against Butler, the insured. *Id.* at 755. Butler was insured by both Home Indemnity Company and Foremost County Mutual Insurance Company. *Id.* Foremost refused to defend Butler and Home tendered a defense to Butler under its workers' compensation policy but did not indicate to Butler that there might be liability coverage under its general policy. *Id.* Both Home and Foremost refused settlement offers within their policy limits, which were $250.000. *Id.*

Prior to trial, an instrument[11] with a covenant not to execute, which was drafted by Home lawyers, was signed by the parties wherein Porcayos agreed not to execute against Butler, and Butler assigned to Porcayos any rights he might have against Foremost (but not against Home). *Id.* After a judgment was rendered against Butler in excess of the policy limits, Foremost settled with Porcayos for $3,200,000, which was still in excess of the limits. *Id.* at 756.

Foremost then sought and obtained a summary judgment against Home for one half of the settlement based upon the contention that Home was a co-insurer, as well as the application of the *Stowers* doctrine.[12] *Id.* The appellate court reversed the summary judgment, holding that Foremost was only entitled to $125,000, which was one half of the policy limits. *Id.* at 762.

In so doing, the court in *Foremost County Mut. Ins. Co.* 1) concluded that "[i]t [was] doubtful that negligence or bad faith was established in the instant case," and 2) concluded that Texas law recognizes the *Stowers* theory upon which the case before us was tried;[13] 3) refused to extend the

---

**10.** The final judgment, which is the subject of this appeal, was signed on January 12, 1990. On rehearing, appellant filed a Motion to Take Judicial Notice on Appeal of a Property Settlement Agreement Incident to Divorce filed on April 12, 1990 in a divorce action between Richard Soriano and his wife Nora, completely unrelated to the action before this court and nonexistent at the time of the trial before us. Unsurprisingly, the majority of the panel denied the motion. Nevertheless, without in any way indicating how this unrelated instrument is relevant or proper to the issues on this appeal, the dissent withdraws the original dissent and substitutes a new opinion including its version of this unrelated instrument, which the majority of the panel has already rejected.

**11.** Unlike the case before us, the agreement was obviously properly introduced below and was therefore properly before the appellate court.

**12.** *G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved).

**13.** The crux of the *Stowers* claim is negligence or bad faith by the insurer directed against the insured ... [and] subsequent harm to the insured. *Id.* at 757.

In Texas a covenant not to execute by an insured does not release an insurance carrier from liability. *See Young Men's Christian Ass'n v. Commercial Standard Ins. Co. ("YMCA")*, 552 S.W.2d 497, 504–05 (Tex.App.–Fort Worth 1977), *writ ref'd n.r.e.*, 563 S.W.2d 246 (Tex.1978) (per curiam).... Therefore, given the Texas law that a covenant not to execute does not release an insurer from liability, one could argue that upon entry of judgment, the Porcayos, by assignment from Butler through the covenant not to execute, held a *Stowers* claim against Home. There are, however, two problems with this theory. First, there was no assignment by Butler of any claims Butler might have against Home, but only of claims against Foremost. Such an assignment of a *Stowers* claim appears to be necessary to Foremost's position. In *Whatley [v. City of Dallas*, 758 S.W.2d 301, 308–09 (Tex.App.—Dallas 1988, writ denied),] the court stated, 'A [*Stowers*] claim that an insurer negligently failed to settle an injured party's action against an insured belongs to the insured and the injured party has no standing to assert it.' (citing several Texas cases). *Whatley* further concluded that where a claim had not been assigned by the insured to the injured party, the injured party did not own that claim. [Footnote omitted.] Second, extending the *Stowers* doctrine to this case on a

*YMCA* rule to apply between co-insurers under the attending circumstances;[14] 4) refused to decide the issue herein involved, which the dissent suggests was therein decided;[15] and 5) specifically declared that their holding should only be used to the disadvantage of another insurer, but not to the disadvantage of the insured.[16] *Id.* at 757.

Thus, *Foremost County Mut. Ins. Co.* is clearly not controlling and obviously completely distinguishable from the case at hand.

Moreover, the measure of damages awarded in cases such as the one before us has been confirmed in *Allstate Ins. Co. v. Kelly,* 680 S.W.2d 595, 606 (Tex.App.—Tyler 1984, writ ref'd n.r.e.), and has been described as follows:

> The rule announced in *Kelly* is that in a case based upon the *Stowers* doctrine, in which an insured sues his insurer on the

basis of a negligent failure to settle, the damages are, as a matter of law, *the amount of the judgment which exceeds the policy limits.*

*William M. Mercer, Inc. v. Woods,* 717 S.W.2d 391, 400 (Tex.App.—Texarkana 1986), *aff'd in part, rev'd in part on other grounds,* 769 S.W.2d 515 (Tex.1988) (emphasis added).

Finally, even if we ignored all the foregoing and agreed that there was error in the instruction and it was properly preserved, since the evidence of the judgment and how it exceeded the policy limits was uncontradicted, we are convinced that the error, if any, did not amount to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause rendition of any improper judgment in the case. Tex.R.App.P. 81(b)(1).

Accordingly, appellant's point of error is rejected.

---

basis of the assignment and covenant not to execute does not serve the policy the courts were attempting to advance in *YMCA* when they created the rule that a covenant not to execute does not relieve the insurer of liability. The purpose of the rule in *YMCA* was to prevent an insurer from escaping liability by treating the policy as one of indemnity rather than liability. *See YMCA,* 552 S.W.2d at 504. In *YMCA,* following a judgment against the insured, an injured party sought damages, in accordance with Texas law, directly from the insurer under a third-party beneficiary theory. The insurer argued, however, that it was not obligated to pay an injured party who had covenanted not to execute against the insured because the covenant insulated the insured from liability, and without liability the insured had no claim to coverage. The court held, though, that the insured's *liability* attached with the judgment; whether the insured paid it was immaterial.

*Id.* at 758–59 (emphasis in original).

**14.** The *YMCA* rule should not be extended to the *Stowers* claim in the instant case.

. . . .

> With regard to *Stowers* damages [footnote omitted], the insured does not need the benefit of the *YMCA* rule where the insured in question, rather than refusing to defend and ignoring its insured, has actively participated in drafting the covenant not to execute that protects its insured.

. . . .

> Under the holding of this case, the insurer is relieved of its liability for a negligent refusal to settle *only* where it defends it insured

and *succeeds in obtaining protection for its insured from all liability.* [Emphasis added.]

. . . .

Whether the *YMCA* rule is applied is material only where there is a covenant not to execute. If no covenant not to execute is forthcoming, the insurer will be responsible for the entire judgment, including any excess over the policy limits, and plaintiff will be aware of this. Thus, in order to induce the plaintiff to enter a covenant not to execute, the insurer must *either* accept an admission of liability (which is effectively equivalent to a settlement) *or* permit itself to be exposed to damages in excess of policy limits (which returns the insurer to the *Stowers* situation). [Emphasis in text.]

*Id.* at 759–60.

**15.** We do not decide the more general question posed by the court in *Whatley* of 'whether a judgment creditor may recover against an insurer damages awarded against its insured in excess of policy limits for which the insured is not personally liable if the insurer has acted negligently or in bad faith.' *Whatley,* 758 S.W.2d at 310 n. 6.

*Id.* at 759, n. 7.

**16.** Therefore, under our decision not to extend the *YMCA* rule the insurer who negligently refuses to settle will be able to use a covenant not to execute only to the disadvantage of another insurer that has breached its duty to the insured (as in the instant case) and *not to the disadvantage of its insured.* [Emphasis added.]

*Id.* at 760.

Appellant also complains that the court erred in rendering judgment against appellant, in overruling appellant's Motion to Disregard Jury Findings and in overruling appellant's Motion for New Trial or for suggestion of remittitur because the evidence is legally and factually insufficient to support the finding of actual damages.

In *Kelly*, 680 S.W.2d at 606, the Tyler court, which was likewise faced with a damage issue in a *Stowers* suit, recognized that "no actual damage issue was required to be submitted because the actual damages sustained ... under each cause of action asserted herein were fixed as a matter of law in the amount of the excess of the judgment rendered ... over the applicable policy limits."

Further, in assessing personal injury damages, the jury necessarily has great discretion in fixing the amount of the damage award. *Bundick v. Weller*, 705 S.W.2d 777, 783 (Tex.App.—San Antonio 1986, no writ), citing *Roberts v. Tatum*, 575 S.W.2d 138 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). There is no fixed guide or rule in measuring damages; thus, the amount determined by the jury is subject to correction only for abuse or excessiveness. *Landreth v. Reed*, 570 S.W.2d 486, 492 (Tex.Civ.App.—Texarkana 1978, no writ). However, a jury's findings on damages will not be disturbed on appeal on grounds of excessiveness if there is any probative evidence to sustain the award. *TriState Motor Transit Co. v. Nicar*, 765 S.W.2d 486, 493 (Tex.App.—Houston [14th Dist.] 1989, no writ). We emphasize, moreover, that it is for the jury to judge the credibility of the witnesses, to assign the weight to be given their testimony, and to resolve any conflicts or inconsistencies in the evidence. *Town & Country Mobile Homes, Inc. v. Bilyeu*, 694 S.W.2d 651, 656 (Tex.App.—Fort Worth 1985, no writ). Therefore, in determining the sufficiency of the evidence, appellate courts must accept the jury's resolution of any conflicts or inconsistencies in the evidence. *Pool*, 715 S.W.2d at 629.

In the present case, the jury clearly found that there was evidence that Soriano had suffered actual damages, but refused to find any damages of mental anguish in the past. We hold that the evidence and reasonable inferences in this record is legally and factually sufficient to support the actual damages award, and that the award of actual damages was not excessive. The point is rejected.

Next, appellant multifariously asserts that the court erred in denying appellant's objections to the charge, in rendering judgment against the appellant, and in overruling appellant's Motion for Judgment Notwithstanding the Verdict because there is no finding and insufficient evidence that any vice principal of the appellant committed conduct for which exemplary damages may be awarded and, alternatively, the answer to Special Issue No. 6 conflicts with the liability findings against the appellant, in which case the trial court erred in overruling appellant's Motion for New Trial.

However, the record reflects, among other things, that Philip Jackson, as appellant's representative and claims manager, had the authority, as well as the ultimate responsibility, to hire and fire; that Jackson made the decision to settle the Lopez claim with full knowledge of the consequences to the insured, Soriano; that Jackson spoke for the appellant in declaring that regardless of whether a jury found appellant's action to be grossly negligent and assessed six million dollars in exemplary damages, appellant would nevertheless act in the same manner towards its insured in the future; and, that Jackson's conduct throughout the process, which the jury concluded amounted to gross negligent and a breach of its duty of good faith and fair dealing, was all on behalf of the appellant.

Additionally, appellant's judicial admissions contributed to show the requisite knowledge to make it liable for punitive damages.[17] Therefore, because the issue

---

**17.** Requests for Admission Nos. 4, 9(a), and 9(b) stipulated to the following: the decision of whether to pay the demand of plaintiffs' attorney Huseman for policy limits, concerning the claims for the death of Maria Medina and personal injuries to Carlos Medina, was that of

concerning the existence of a vice principal, who was acting on the part of the appellant, was conclusively established by the evidence, no issue was required to be submitted by the court. *City of Wichita Falls v. Ramos*, 596 S.W.2d 654, 658 (Tex.Civ. App.—Ft. Worth 1980, writ ref'd n.r.e.).

In the alternative, appellant argues that Special Issue No. 6 conflicts with the liability findings against the appellant.

Special Issue No. 6 inquires:

> Was Fred C. Auforth, deceased, negligent in a manner in which he handled the settlement of claims against Richard R. Soriano and was such negligence, if any, a proximate cause of excess judgment in Webb County, Texas against Richard R. Soriano?
>
> Answer "Yes" or "No" by marking in the appropriate column.
>
> YES  NO
>
> _____  no

Appellant argues that because the jury found that Auforth, appellant's trial attorney, was not negligent in his handling of the case, the trial court should have found the jury's findings that the appellant was liable to be in conflict with the jury's answer to Special Issue No. 6.

■ However, the record reflects that Auforth, apparently recognizing the potential danger for a bad faith suit due to the multiple claims and the inadequate insurance coverage, recommended in vain that the appellant place the insurance proceeds into the registry of the court. While not only being the most prudent action, this would have evidenced the appellant's willingness to proceed with caution in all deference to its insured's rights and welfare. Moreover, it is clear that the ultimate decisions to refuse to place the proceeds in the registry of the court, and to make the settlement in question, were made by the appellant and not their attorney.

■ Furthermore, it is clear that the appellant had an independent duty to protect Soriano against the Medinas' claims, which was not discharged by the mere hiring of an attorney. *Highway Ins. Underwriters v. Lufkin–Beaumont Motor Coaches, Inc.*, 215 S.W.2d 904, 932 (Tex. Civ.App.—Beaumont 1948, writ ref'd n.r.e.) (op'n on reh'g) (the insurer assumes control of insured's defense, and any responsibility incidental to this control remains with the insurer). Accordingly, appellant's point is overruled.

Appellant additionally argues that the court erred in rendering judgment against appellant and in overruling appellant's Motion to Disregard Jury Findings, Motion for Judgment Notwithstanding the Verdict and Motion for New Trial because Special Issue No. 4, that appellant acted intentionally and knowingly, is not supported, either legally or factually, by the evidence.

■ Requests for Admissions 9a and 9b, regarding the appellant's intentional and knowing conduct, state the following:

> REQUEST NO. 9: Admit or deny that Farmers intentionally and knowingly settled the Lopez death claim at a time when:
>
> (a) The claims for the death of Maria Medina and the injuries to Carlos Medina could have been settled for policy limits totaling $20,000.00;
>
> (b) Farmers knew the Lopez settlement would reduce the insurance coverage on its policy to a figure below that needed to meet the settlement offer for such Medina claims.

In the Defendant's Response to Requests for Admissions and Interrogatories, appellant admitted to both 9a and 9b. Additionally, the record reflects that although the appellant knew and was informed by its attorney of a possible bad faith claim arising under these facts, the appellant failed to heed its attorney's advice to deposit the

Farmers; Farmers intentionally and knowingly settled the Lopez death claim at a time when the claims for the death of Maria Medina and the injuries to Carlos Medina could have been settled for policy limits totaling $20,000.00; and, Farmers intentionally and knowingly settled the

Lopez death claim at a time when Farmers knew the Lopez settlement would reduce the insurance coverage on its policy to a figure below that needed to meet the settlement offer for such Medina claims.

policy limits into the registry of the court. Instead, the appellant knowingly settled a lesser claim with full knowledge of the consequences to the insured, exposing the insured to greater harm. Appellant's point is overruled.

■ Appellant next complains that the trial court erred in rendering judgment against appellant, and in overruling appellant's Motion to Disregard Jury Findings, Motion for Judgment Notwithstanding the Verdict, and Motion for New Trial or for suggestion of remittitur because the evidence is legally and factually insufficient to support the excessive award of $5,000,000 in exemplary damages and further, the exemplary damages award violated appellant's right to due process and equal protection under the Texas and federal constitutions, as well as the prohibition against excessive fines contained in TEX.CONST. art. I, § 19.

Initially, we note that the United States Supreme Court has recently held that the common law method for assessing punitive damages is not so inherently unfair as to deny due process and be *per se* unconstitutional, stating that "[a]s long as the discretion is exercised within reasonable constraints, due process is satisfied." *Pacific Mut. Life Ins. Co. v. Haslip,* — U.S. —, —–—, 111 S.Ct. 1032, 1043–44, 113 L.Ed.2d 1 (1991).

In the case before us, the jury was properly instructed that

'GROSS NEGLIGENCE' means such an entire want of care as to indicate that the act or omission in question was the result of conscious indifference to the rights, welfare, or safety of the persons affected by it; and, that 'EXEMPLARY DAMAGES' means an amount that you may, in your discretion, award as an example to others and as a penalty or by way of punishment.

We hold that these were "reasonable constraints" within which the jury could exercise its discretion in imposing reasonable exemplary damages.

However, the supreme court, obviously concerned with runaway fact finders, also contemplated a careful appellate review for reasonableness of the exemplary damages, stating:

Under the traditional common-law approach, the amount of the punitive award is initially determined by a jury instruction to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable.

. . . .

We note again our concern about punitive damages that "run wild." ...

One must concede that unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities.

. . . .

This appellate review makes certain that the punitive damages are [1] reasonable in their amount and [2] rational in light of their purpose to punish what has occurred and to deter its repetition.

*Haslip,* — U.S. at —, —–—, 111 S.Ct. at 1042–43, 1045.

In *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981), the Texas Supreme Court directed that appellate review proceed along these lines:

Exemplary damages must be reasonably proportioned to actual damages. There can be no set rule or ration between the amount of actual and exemplary damages which will be considered reasonable. This determination must depend upon the facts of each particular case. Factors to consider in determining whether an award of exemplary damages is reasonable include (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety.

Whether the amount of damage awarded by the jury is excessive is a question of fact.

*Id.* at 910 (citations omitted). The Texas Supreme Court has reaffirmed this approach to appellate review of exemplary damages. *See Wright v. Gifford-Hill & Co., Inc.,* 725 S.W.2d 712, 714 (Tex.1987); *Tatum v. Preston Carter Co.,* 702 S.W.2d 186, 188 (Tex.1986).

■ Further, in determining whether a damage award is excessive, the appellate court must view the evidence and facts of the case in the light most favorable to the damage award. *Chemical Express v. Cole,* 342 S.W.2d 773, 780 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r.e.). While exemplary damages must be carefully reviewed for reasonableness, the amount to be awarded as exemplary damages generally rests in the discretion of the jury, *Southwestern Inv. Co. v. Neeley,* 452 S.W.2d 705, 708 (Tex.1970), and will not be disturbed on appeal on the grounds of excessiveness if there is probative evidence to support it. *See Delta Drilling Co. v. Cruz,* 707 S.W.2d 660, 666 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). Further, "unless the award is so large as to indicate that it is a result of passion, prejudice, or that the evidence has been disregarded, the verdict of the jury is conclusive and will not be set aside as excessive, either by the trial court or on appeal." *Kraus v. Alamo Nat'l Bank,* 586 S.W.2d 202, 208 (Tex.Civ.App.—Waco 1979), *affirmed and cited with approval, Alamo Nat'l Bank v. Kraus,* 616 S.W.2d at 910.

Under Tex.R.App.P. 85, remittitur may be ordered by an appellate court only if it finds that the trial court abused its discretion in refusing to suggest a remittitur.

*Texaco, Inc. v. Pennzoil, Co.,* 729 S.W.2d 768, 864 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dismissed,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988).

In *Texaco,* the court held that the trial court abused its discretion in not suggesting remittitur where there was no evidence that the tort feasor intended to injure, but merely "cared little if such injury resulted from its interference". *Id.* at 864. The court stated that even though "[t]he punitive damages only amounted to approximately 40% of actual damages," ... "[c]onsidering the type of action, the conduct involved, and the need for deterrence" a point had been reached "where punitive damages ... overstate[d] their purpose and serve[d] to confiscate rather than to deter or punish." *Id.* at 866.

Among other things heretofore set out, the record before us reflects that appellant knowingly and intentionally settled the Lopez case, in spite of the fact that the other outstanding claims were extremely more severe and that the Lopez claim would probably not be pursued; that appellant knew it was exposing the appellee to considerable personal liability upon settling the Lopez claim; [18] that the Lopez settlement was settled over the disapproval of Soriano's personal attorney; that appellant earned premiums exceeding $53,000,000 in 1987; and, that the appellant insisted that it would handle a similar case exactly the same way in the future, even if it were assessed punitive damages in the amount of six million dollars.[19]

---

**18.** The totality of the evidence also supports the reasonable inference which the jury may have deducted that appellant's actions, at least partially, were a result of retaliation by the appellants because the Medinas had rejected their initial $20,000 offer and opted to retain an attorney instead.

**19.** The concurring opinion justifies its enormous remittitur by giving little significance to the statements of Farmers' claims manager Jackson who had the ultimate responsibility for this case, concluding that the remarks could be interpreted as expressing conscious indifference or a "good faith opinion" that "they did nothing wrong." This conclusion is difficult to rational-

ize considering the actual exchange, which is set forth as follows:

> Q: All right. Let me ask you this. If a jury in Duval County thinks that Texas Farmers was guilty of gross negligence in the way that they handled this case and assessed punitive damages in the sum of Let's say six million dollars and here after this same situation came up would Texas Farmers still handle it the same way?
>
> A: Yes, sir. We would handle it exactly the same way because we did nothing wrong.

The question and the answer are quite clear and the jury obviously reached the only conclusion possible from the exchange; that Farmers would not be deterred from doing the very same

In determining whether the trial court abused its discretion in failing to suggest remittitur, we must consider all the factors of *Kraus* and the totality of the record. In addition to all that has been set out heretofore, we note that the jury awarded *$235,-479.13* as actual damages with interest, and *$5,000,000.00* as exemplary damages, which is a ratio of more than 21 to 1. Further, although there was evidence from which the jury could have reasonably concluded that appellant "cared little if injury resulted," there was no evidence of actual animosity of the appellant towards either Soriano or the Medinas. *Texaco*, 729 S.W.2d at 864. Moreover, the record clearly indicates that it was the negligence of Soriano, brought on primarily by his drinking, that caused the terrible accident that initiated this entire process. On the other hand, considering the deterrence factor, we are considerably troubled, as apparently the jury was, with the insistence of appellant's claims manager, that appellant would be undeterred in continuing this same course of action even if assessed six million dollars in punitive damages.

■ Nevertheless, after a careful review of the totality of the evidence as required by the United State Supreme Court in *Haslip*, and considering the factors espoused by the Texas Supreme Court in *Kraus*, we conclude that the punitive damages assessed are excessive and that the trial court abused its discretion in not suggesting a remittitur. We find that the exemplary damages assessed are inconsistent with the degree of appellant's culpability, with the punishment for what has occurred, and with the desired deterrent effect on its repetition. We hold that in this case, punitive damages of one million dollars are sufficient to satisfy all reasons for their being awarded. The award of punitive damages is excessive by four million dollars. The point is sustained.

■ Finally, appellant insists that the trial court committed reversible error in overruling appellant's Motion to Modify, Correct, or Reform the judgment because of the judgment award's excessive and duplicative interest.

The trial court submitted the damage question with an instruction which read:

What sum of money if now paid in cash would fairly and reasonably compensate Richard R. Soriano for his damages by reason of the trial in Webb County, Texas the resulting excess judgment.

Take into consideration the following elements of damages and none other[:]

The difference between the excess judgment taken against Richard R. Soriano *with interest to date*, and the amount paid by Texas Farmers Insurance Co. toward satisfaction of such judgment. (Emphasis added.)

No objection was made to the inclusion of the words "with interest to date," nor was an alternate instruction submitted. Nevertheless, appellant argues that the jury improperly awarded Soriano pre-judgment interest and in effect, improperly awarded pre-judgment interest twice.

As recognized by the Tyler Court of Appeals, *Stowers* allows recovery for post-judgment interest. *Kelly*, 680 S.W.2d at 611, citing *G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App.1929, holdings approved). In *Kelly*, the court was confronted with a *Stowers* suit wherein the plaintiff sought post judgment interest. *Id.* The court found that the plaintiff's petition, which sought recovery for damages, including interest and court costs, stated a cause of action for the amount sued for and, therefore, post judgment interest was recoverable. *Id.*

In the present case, Soriano's petition reflects that Soriano was seeking "the full amount of his damages." Accordingly, we see no reason why, and the appellant has failed in its burden of showing a valid

thing again, even after being hit with a punitive damage award of six million dollars. Further, the opposite conclusion to that obviously reached by the jury is even more difficult to rationalize considering that it is the jury that

determines matters of interpretation of fact after considering the totality of the evidence; this court is prohibited from substituting its own interpretations for those of the jury. *Pool,* 715 S.W.2d 629.

reason why, the appellee should be precluded from recovering post judgment interest.

However, we agree with the appellant that the judgment before us awards prejudgment interest twice. Special Issue Nine instructed the jury as following regarding damages:

Take into consideration the following elements of damages and none other.

The difference between the excess judgment taken against Richard R. Soriano with interest to date, and the amount paid by Texas Farmers Insurance Co. toward satisfaction of such judgment.

Answer in dollars and cents, if any.

ANSWER: $ 235,479.13

The jury award of $235,479.13 obviously includes prejudgment interest from the date of the excess judgment taken against Richard Soriano in January 24, 1982, through the date of the jury verdict before us.

The trial court's judgment in the present case, dated January 12, 1990, awards actual damages of "$520,577.24 (such amount being $235,479.13 actual damages found by the jury *plus pre-judgment interest thereon at 10% per annum, compounded daily from January 24, 1982 to date of this judgment*) plus the sum of FIVE MILLION ($5,000,000) DOLLARS found by the jury as exemplary damages, for a total of $5,520,577.24...." (Emphasis added.)

In other words, the *jury verdict* in December 1989 awarded pre-judgment interest from January 24, 1982 and then the *trial court's judgment,* in January 1990, awarded it again. That is a double recovery of prejudgment interest and Farmers' failure to object to the *special issue* did not waive its right to insist in its Motion to Correct, or Reform the Judgment that the *judgment* not award prejudgment interest a second time.

The trial court should have awarded prejudgment interest in its judgment only from the date of the verdict to the date of the judgment before us, since the jury verdict had already awarded pre-judgment interest for any time prior to that, which had already been incorporated in the judgment. Therefore, the judgment should be reformed by subtracting from the judgment the prejudgment interest previously awarded by the jury in its verdict, and including in the judgment only the prejudgment interest from the date of the verdict to the date of the judgment.

Consequently, if within 30 days from the date of this opinion, appellees file in this Court a remittitur of four million dollars, the judgment of the trial court will be ordered reformed 1) to reduce the exemplary damages to one million dollars, and 2) to eliminate prejudgment interest assessed twice, as reflected in this opinion; and as reformed, will be affirmed; otherwise, the judgment will be reversed, and the cause remanded for a new trial.

REEVES, Chief Justice, concurring.

I reluctantly concur with the majority. Justice Peeples' dissent is persuasive, but I simply do not believe the concept urged in his dissent was preserved in the trial court.

BIERY, Justice, concurring.

The opinion of July 22, 1992, is withdrawn and the following is substituted.

To say that this case has caused reasonable minds to differ during the many months of its pendency is a classic understatement. In this intermediate appeal, the case is now in the following posture:

(a) I concur with the result affirming the actual damage judgment and disagree with the dissent's analysis of the elements of the cause of action for the reasons stated below.

(b) I agree the judgment should be reformed to delete double recovery of pre-judgment interest.

(c) I agree that a remittitur of a portion of the exemplary damage judgment should be suggested; however, I would suggest that $4,750,000 of the $5,000,000 exemplary damage award is a reasonable remittitur, leaving $250,000 in exemplary damages.

With reference to the threshold question of preservation of error, I agree that Rule 279 of the Texas Rules of Civil Procedure

provides for preservation of a no evidence point by motion for judgment not withstanding the verdict. Thus, while alleged error on the no evidence point may have been preserved, the argument, analysis and out of state authorities utilized by the dissent emerged for the first time in this case on appeal. The trial judge had no opportunity to consider, respond, and rule on the theory utilized by the dissent. It would seem axiomatic that, before a trial judge is said to have committed reversible error in the handling of a case, the trial judge ought to have the opportunity to correct any error by being privy to the same arguments, analysis, and authorities used by an appellate court to support its finding of reversible error. *See Cecil v. Smith,* 790 S.W.2d 709, 715 (Tex.App.—Tyler 1990), *rev'd on other grounds,* 804 S.W.2d 509, 510 (Tex.1991); *Intermarket U.S.A. v. C–E Natco,* 749 S.W.2d 603, 606 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *W.H. McCrory & Co. v. Contractors Equip. & Supply Co.,* 691 S.W.2d 717, 721 (Tex.App.—Austin 1985, writ ref'd n.r.e.); *see also* Tex.R.App.P. 52(a).

## I. ELEMENTS OF CAUSE OF ACTION IN UNDERINSURANCE CASE.

Given the hard facts of Farmers predicament of too many serious claims and not enough coverage, and conflicting evidence about what offers and counter-offers were communicated among the various attorneys and parties, I may not have reached the same conclusion as did the fact finding jury.[1] The granting of a new trial also may have been a preferable option but that power and discretion is vested in the trial judge who has viewed the live proceedings, not in appellate judges who review a cold, one-dimensional record. As accurately stated by the majority, we are not at liberty to substitute our opinion about the facts if there is legally and factually sufficient evidence to support the verdict.

The dissent contends the no evidence point should be sustained because Soriano did not prove the Lopez settlement was made in bad faith. While the legal analysis of the dissent is seductive in extricating Farmers from this particular judgment, I cannot agree with the breadth of the proposed holding which would have the jury focus only on the tree (the settlement of the Lopez claim) and not look at the forest (the reasonableness or unreasonableness of Farmers handling of the entire claims process). As I understand Texas law, the duty of good faith and fair dealing is owed by the carrier (Farmers) to the insured (Soriano). In order for the factfinder to weigh whether there was a breach of the duty to the insured, it necessarily must be allowed to take into account all relevant factors and relationships.[2]

As conceded by the dissent, there is no Texas authority directly on point in this type of underinsurance case. Further, the out of state authorities relied upon may or may not be factually on point. On the other hand, it appears that the trial judge was following the closest law available in submitting the case similarly to the submission in *Ranger County Mut. Ins. Co. v. Guin,* 723 S.W.2d 656 (Tex.1987). In compliance with Tex.R.Civ.P. 277, the trial judge broadly asked whether a breach of the duty of good faith and fair dealing occurred. As stated previously, the trial judge did not have the benefit, either at the issue submission stage, or the judgment n.o.v. stage, of the new law proposed by the dissent. While I agree that there are distinguishing factors between the usual *Stowers* case and an underinsurance case,

---

**1.** I note also the conflicting expert opinion evidence, *e.g.* Guy Allison's testimony that Farmers was not negligent and David Hockema's testimony that Farmers was negligent.

**2.** Since our original opinion of July 22, 1992, a relatively new concept has been proposed which, had it been applied here, may have ameliorated some of the "hard facts make bad law" aspects of this case. Although not argued by Farmers, and therefore not applicable, the emerging idea of "comparative bad faith" is a logical extension of the notion that the factfinder, in its search for truth, should be able to look at the whole forest and not just a few of the trees. This should include a view of the insured's conduct as well as the insurer's cause of action. *See* James Wm. Walker, *Comparative Bad Faith—Its Time Has Come in Texas,* 55 Tex.B.J. 792 (1992).

the ultimate issue still remains whether the carrier breached its duty to the insured. I believe the law to be better served if the factfinder looks at all the relevant evidence surrounding the insurer/insured relationship and not focus only on one isolated part of the relationship.

To the extent that the dissent can be interpreted to say there ought to be some way for an insurer to protect itself from bad faith claims in this type of underinsurance situation, I agree. Even though interpleading of the funds would not discharge the carrier of its responsibility to provide a defense and otherwise remain involved until the disposition of the claims, it would certainly be *per se* evidence of good faith intentions and would negate any inference that the carrier was trying to increase its profits by not paying the full amount of coverage. This type of rule, it seems to this author, would be a far less radical change in Texas law than that proposed by the dissent, and would continue to allow the jury to look at the whole and not focus merely on some of the parts of the insurer/insured relationship.

Even if the concept of interpleader as a *per se* negation of bad faith was to evolve into a common law rule in Texas or become statutory law, the evidence is undisputed in this case that Farmers was advised by its counsel to do just that and steadfastly refused. Clearly, the jury seemed to understand this distinction when it made a negative finding of negligence on the part of attorney Auforth, who gave the advice to interplead to Farmers, versus the positive findings of breach of good faith and fair dealing as to Farmers, which refused to follow their own attorney's advice.

The dissent also bases its proposed new law, in part, on the fear that a carrier might get "set up." I would simply note that there is absolutely no evidence, nor even an allegation, of any conspiracy or attempt to "set up" in this case. *See e.g., Metromedia Long Distance, Inc. v.*

*Hughes,* 810 S.W.2d 494, 495–98 (Tex. App.—San Antonio 1991, writ denied).

Finally, if Texas law was to revert to inquiry by the jury about narrow parts (e.g. the Lopez settlement) of the picture as proposed by the dissent, the case, at the very least, should be remanded so that the trial judge, counsel and parties could try the case under the new rules.

## II. EXEMPLARY DAMAGES.

Concerning the issue of constitutional due process as it relates to the exemplary damage award, the dissent contends that Texas procedures do not comply with due process requirements; however, the United States Court of Appeals for the 5th Circuit has found that Texas post-trial review procedures do meet the procedural due process requirements established by *Haslip. Glasscock v. Armstrong Cork Co.,* 946 F.2d 1085 (5th Cir.1991). The Texas Supreme Court has not addressed the constitutional due process issue since the United States Supreme Court's pronouncement in *Pacific Mut. Life Ins. Co. v. Haslip,* — U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).[3] Initially, I note that the Texas Supreme Court in *Pennington v. Singleton,* 606 S.W.2d 682 (Tex.1980), addressed the constitutional due process issue of excessive fines as it related to the Deceptive Trade Practices Act. Justice McGee, speaking for the Court, held that "the states possess a wide latitude of discretion in the matter of imposing fines, and 'their enactments transcend the limitation only where the penalty prescribed is to severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable.'" *Id.* at 690, citing *St. Louis, Iron Mountain & S. Ry. Co. v. Williams,* 251 U.S. 63, 66–67, 40 S.Ct. 71, 73, 64 L.Ed. 139 (1919). In 1986 and 1987, the Texas Supreme Court addressed the standard of review for remittitur in punitive damage cases, overruled the abuse of discretion standard of *Flanigan v. Carswell,* 159 Tex. 598, 324 S.W.2d 835, 839 (1959) and substi-

**3.** We are mindful, however, of *Transportation Ins. Co. v. Moriel,* 814 S.W.2d 144 (Tex.App.—El Paso 1991, writ granted).

tuted the factual sufficiency standard of *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641–42 (Tex.1987) and *Pope v. Moore*, 711 S.W.2d 622, 623–24 (Tex.1986). Recently, several Texas intermediate appellate courts have addressed the issue of due process in relation to punitive damage awards and unanimously have found no constitutional violation. *K–Mart Corp. v. Pearson ex rel. Ramos*, 818 S.W.2d 410, 417 (Tex.App.—Houston [1st Dist.] 1991, no writ); *Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 687 (Tex.App.—Texarkana 1991, no writ); *Bard v. Charles R. Myers Ins. Agency, Inc.*, 811 S.W.2d 251, 253 (Tex.App.—San Antonio 1991, writ granted); *State Farm Mut. Auto Ins. Co. v. Zubiate*, 808 S.W.2d 590, 603–04 (Tex.App.—El Paso 1991, writ denied).[4] I also note that, although not applicable to this case because it was pending before passage, the Texas legislature has addressed the question of standards for recovery of exemplary damages and limitations thereon in abrogation of common law concepts, in TEX.CIV.PRAC. & REM.CODE ANN. §§ 41.001 *et seq.* (Vernon Supp.1992).

Turning to the punitive damage award of $5,000,000 in this case, I am struck by the anomalous factual background which was the genesis of the litigation leading ultimately to the multi-million dollar award: an insured (Soriano) carrying minimum insurance coverage commits grossly negligent and reckless conduct causing great tragedy to the Medina and Lopez families; these circumstances were then laid in the lap of Farmers which, as found by the jury, was in breach of its duty of good faith and fair dealing to Soriano. Based on the jury verdict, Farmers is punished and Soriano benefits, from the catastrophe created by Soriano. But for the assignment of Soriano's claim against Farmers to the Medinas, we would have an even more "Alice in Wonderland" result of Soriano becoming a multimillionaire notwithstanding his own recklessness. Distilled to its lowest monetary sum, a $5,000 dispute ($20,000 total insurance coverage minus $15,000, the amount remaining for the Medina claims after settling the Lopez claim) has now

mushroomed to a $6,000,000 judgment, inclusive of interest.

In spite of Soriano's calamitous conduct which began this litigation journey, our higher duty to the rule of law requires that we (a) remember this case does not involve Soriano's conduct and (b) are bound to follow existing Texas precedent.

In applying the *Kraus* factors a number of Texas appellate courts have concluded that exemplary damage awards required remittitur. Ultimately, whether we apply *Kraus* or *Haslip*, the final decision on how much, if any, to remit involves judging the reasonableness of the exemplary damages. For example, in *State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d at 593–94, the insureds brought an action against their automobile insurer alleging breach of good faith and fair dealing. Following a jury trial, judgment was entered in favor of the plaintiffs for $165,000 for mental anguish, and $15 million as exemplary damages. *Id.* at 596. Finding the evidence was not sufficient to support the amount of the punitive damage award, the court of appeals ordered a remittitur in the amount of $14,340,000 stating:

> [w]e therefore find that the award of $660,000.00 as punitive damages under the evidence of this case would be fair, proper and **reasonable** yet consistent with the intent of purposes of allowing recovery of such damages....

*Id.* at 606 (emphasis added).

In *Plaza Nat'l Bank v. Walker*, 767 S.W.2d 276, 277 (Tex.App.—Beaumont 1989, writ denied), several depositors brought an action against a bank, alleging breach of contract, fraud, conversion and violations of the Consumer Protection Deceptive Trade Practices Act. Following a jury trial, judgment was entered in favor of the plaintiffs for $400.00 for actual damages and $20,000 as exemplary damages. In ordering a remittitur of $10,000, the court of appeals found:

> [a]t the request of Appellant, the court gave a thorough definition which includ-

---

**4.** *See also,* Jane Webre, *Due Process Constraints on Punitive Damage Awards: Are There Any?*, 55 TEX.B.J. 14 (1992), an excellent review of the current state of punitive damage law.

ed the requirements of exemplary damages. Of course, exemplary damages must also be **reasonably** proportioned to the amount of actual damages. The **reasonableness** of any particular award is to be measured on a case by case basis. We think that the award of $20,000 is excessive by $10,000.

*Id.* at 278 (emphasis added) (citations omitted).

In *Underwriters Life Ins. Co. v. Cobb,* 746 S.W.2d 810, 817–18 (Tex.App.—Corpus Christi 1988, no writ), the court of appeals determined that:

[t]he amount of exemplary damages awarded must be rationally related to actual damages, and this relationship is a tool to aid the court in determining, depending on the facts of each case, whether the award was excessive. Other factors to be considered in determining the **reasonableness** of exemplary damages are the nature of the wrong, the character of the defendant's conduct, the degree of the defendant's culpability, the situation and sensibility of the parties, and the extent to which the conduct offends the public sense of justice and propriety.

(emphasis added) (citations omitted). After reviewing the evidence as it related to the criteria set forth above, the court restated the general rule that "exemplary damages must bear a **reasonable** relationship to the actual damages suffered," and ordered a reduction of $500,000 in the plaintiffs' $1 million exemplary damage award. *Id.* at 819, (emphasis added).

In *Interfirst Bank Dallas, N.A. v. Risser,* 739 S.W.2d 882, 886–87 (Tex.App.— Texarkana 1987, no writ), the beneficial owners of stock in a closely held corporation sued a bank trustee alleging a breach of trust in selling the stock below fair market value. A judgment was entered in favor of the plaintiffs for $1 million in actual damages and $10 million as exemplary damages. *Id.* at 887–88. The court of appeals noted:

[e]xemplary damages must be **reasonably** proportioned to actual damages, but there can be no set formula for the ratio

between the amount of actual and exemplary damages. This determination must depend upon the facts of each particular case.... In the present case, the exemplary damages amount to approximately 7½ times the actual damages, which does not violate the **reasonable** relationship test.

*Id.* at 909. Chief Justice Cornelius, in a concurring opinion, went on to state:

[i]n judging the **reasonableness** of punitive damages, we consider the nature of the wrong, the character of the conduct involved, the degree of the wrongdoer's culpability, the situation and sensibilities of the parties and the extent to which the conduct offends a public sense of justice and propriety.

*Id.* (citation omitted). After considering the five factors set forth above, as well as "the amount of exemplary damages which is necessary and proper to serve the purposes of punishment and deterrence" the court found the amount of $10 million exemplary damages to be excessive, ordered a remittitur of $7,321,250, and reformed the judgment of the trial court to $2,678,-750. *Id.*

In *Preston Carter Co. v. Tatum,* 708 S.W.2d 23, 23 (Tex.App.—Dallas 1986, writ ref'd n.r.e.), the potential buyer of real estate sued an agent for breach of an agency agreement and fiduciary duty. Following a jury trial, the court entered judgment for the plaintiffs for actual damages and exemplary damages. *Id.* at 23–24. The court of appeals affirmed as to the sum of actual damages and reversed and rendered as to other damages and ordered a remittitur to preserve the ratio between reduced actual damages and exemplary damages. The plaintiffs appealed. *Id.* at 24. The Texas Supreme Court remanded for recalculation of exemplary damages. On remand, the court of appeals held that exemplary damages of $300,000 was excessive and should have been reduced to $75,000, following the appellate reduction of compensatory damages from $165,000 to $40,-000. The court stated:

[a]n award of exemplary damages rests largely in the discretion of the jury and

will not be set aside as excessive unless the amount is so large as to indicate that it is the result of passion, prejudice, or corruption, or that the evidence has been disregarded. The supreme court has declared, however, that verdicts are not always right and, if uncontrolled, will in some cases lead to oppression. Excessiveness may be indicated when the jury has probably considered improper items of alleged compensatory damages in assessing exemplary damages. Here it is probable that in assessing exemplary damages of $300,000 the jury considered the improper and highly speculative conclusions presented by [plaintiff] in an effort to recover elements of damages now held to be improper. Accordingly, ... we conclude that a **reasonable** award of exemplary damages would be no more than $75,000 and that the award of $300,-000 is excessive by $225,000.

*Id.* at 25 (emphasis added) (citations omitted).

The amount of remittitur of exemplary damages was also addressed by the court of appeals in *Ford Motor Co. v. Durrill,* 714 S.W.2d 329, 333 (Tex.App.—Corpus Christi 1986), *vacated upon agr.,* 754 S.W.2d 646 (Tex.1987), a wrongful death and survival action based on a products liability claim. The trial court reduced the jury's award of $6,861,663 in actual damages to $2,300,000 and the jury's award of $100 million in exemplary damages to $20 million. On appeal, the defendant complained of the lack of evidence to support the $20 million award as remitted by the trial court. *Id.* at 343. In deciding that a further remittitur was warranted, the court of appeals stated:

[i]t has been said that the ratio between the actual damages and the exemplary damages should be reasonably proportional. However, the rule of **reasonable** proportionality does not, by, itself, fix a particular ratio....

*Id.* at 346 (emphasis added) (citations omitted). After reviewing the defendant's conduct, degree of culpability and the extent to which the defendant's conduct offended a public sense of justice and propriety, the court determined that the verdict, even as

remitted by the trial court still "shock[ed] [the] conscience;" and found that a reasonable remittitur was in order. *Id.* at 347.

In *Texas Nat'l Bank v. Karnes,* 711 S.W.2d 389, 391 (Tex.App.—Beaumont), *rev'd in part,* 717 S.W.2d 901 (Tex.1986), the cosigner of a note and her husband brought suit against a bank for removing money from their savings account after repossession of a vehicle securing the note. The trial court entered judgment for the plaintiffs in the amount of $3,474.41 for actual damages and $50,000 as exemplary damages. The court of appeals found that "some exemplary damages" were proper and reasonable, but reduced the $50,000 punitive damages award to $20,000. *Id.* at 396–97. The Texas Supreme Court subsequently reversed and vacated the exemplary damage award because no actual damages were found based on a tort cause of action. 717 S.W.2d at 902.

Moreover, in *Jim Walters Homes, Inc. v. Reed,* 703 S.W.2d 701, 703 (Tex.App.—Corpus Christi 1985), *aff'd in part, rev'd in part,* 711 S.W.2d 617 (Tex.1986), homeowners brought an action against a housing contractor for violations of the Texas Deceptive Trade Practices Act, breach of contract, breach of express and implied warranties and gross negligence. The trial court entered judgment for the plaintiffs in the amount of $11,884 in actual damages and $500,000 exemplary damages. *Id.* at 704. The exemplary damages were reduced by the trial court to $450,000. The court of appeals reduced this amount to $225,000, stating "although this conduct is reprehensible, we do not believe that it is of a character that warrants an award of exemplary damages in this amount." *Id.* at 707. The Supreme Court of Texas later reversed the award of exemplary damages, as no actual damages were found based upon a tort cause of action. 711 S.W.2d at 618.

Finally, in *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 784 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dism'd,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988), a prospective stock buyer brought suit alleging tortious interfer-

ence with a contract for stock purchase-merger. The court of appeals found that punitive damages of $3 billion were excessive and, under New York state court decisions, ordered a remittitur of $2 billion dollars. The court found:

> [c]onsidering the type of action, the conduct involved, and the need for deterrence, we are of the opinion that the punitive damages are excessive and that the trial court abused its discretion in not suggesting a remittitur.... There is a point where punitive damages may overstate their purpose and serve to confiscate rather than to deter or punish. In this case, punitive damages of one billion dollars are sufficient to satisfy any reason for their being awarded....

*Id.* at 866.

Whether applying *Kraus, Haslip*, or the language from the appellate court opinions cited above, the final decision of whether to order a remittitur and in what amount ultimately involves the essence of judging: coming to a reasonable conclusion based upon careful consideration of the law and facts in a particular case.

Applying these standards to the specific facts here, I agree with the dissent that there is no evidence in the record that Farmers profited from its settlement with Lopez for $5,000. There is evidence of $53,000,000 in premiums earned by Farmers during a given year; however, there is apparently no evidence of its profit margin and, indeed, Farmers quickly offered its entire $20,000 policy limits, for which very little premium likely was paid, soon after the accident. There is no evidence that the conduct complained of was concealed or that Farmers had engaged in similar conduct in the past. Further, concerning the situation and sensibilities of the parties, as pointed out above, it was Soriano, not Farmers, whose conduct created the tragedy in the first instance. Finally, my sense of justice and propriety is simply not offended to the extent of $5,000,000 by Farmers' conduct. While I am not prepared to

say that there is no evidence which would justify exemplary damages, I do note the deposition testimony of Farmers representative read into the record can be interpreted in two ways. On the one hand, the jury could have interpreted it as an expression of contempt and defiance of a jury award of exemplary damages, *i.e.* "We don't care what the jury says, we will behave as we please." On the other hand, it could be interpreted as a good faith opinion that "we didn't do anything wrong." Even giving deference to the apparent negative interpretation by the jury, I cannot agree that Farmers conduct, taken as a whole, necessitates $5,000,000 in punishment.

Accordingly, I concur in the result affirming the actual damage award, reforming the judgment to delete a double recovery of pre-judgment interest and would suggest a remittitur of the exemplary damage award in the amount of $4,750,000.

PEEPLES, Justice, dissenting.

I disagree with the majority on three main issues. (1) I disagree about the circumstances in which an *underinsured* tortfeasor can recover an excess judgment from his insurer when he did not purchase enough insurance coverage to compensate for the multiple deaths and injuries that his negligence caused. Here, in contrast to the usual *Stowers*[1] and bad-faith suit, early in the litigation the insurer offered to pay policy limits to settle the claims against its insured, but those limits were inadequate to settle all the claims. I disagree with the majority's apparent definition of the bad faith cause of action in an underinsurance case, an issue of first impression in Texas. (2) I would hold that as a matter of law the facts do not justify exemplary damages, and that the procedures followed in this case do not satisfy due process. (3) Finally, I dissent from the majority's approval of the damage issue, in which the court instructed the jury to award the full amount of the excess judgment (less payments made), even though

1. *G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved).

the original plaintiffs had given Soriano (the original defendant) a covenant not to execute, which reduced or eliminated his damages.

The majority affirms the liability part of Soriano's judgment against his insurer, appellant Farmers. The judgment includes $520,777 in actual damages and $5 million in exemplary damages; the majority affirms the actual damages and $1 million of the exemplary damages. The judgment rests on the theory that Farmers' $5000 settlement with one of two sets of claimants was improper. That settlement reduced the available insurance coverage from $20,000 to $15,000, which the second set of claimants would not accept. I would adopt the rule followed by virtually every authority in this country which has considered the elements of proof required, and hold that the record does not contain legally sufficient evidence of a bad-faith cause of action in this underinsurance context. I would therefore reverse and render judgment that Soriano take nothing from Farmers.

The facts in this litigation are worth restating. On a rainy morning in September 1978, Soriano negligently caused a wreck on the highway while speeding and trying to pass a truck in a no-passing zone on a hill. He had not slept for the previous 24 hours, having just returned from an all-night journey into Mexico. Soriano's car met the Medina family's car head-on in their lane, killing Mrs. Medina and injuring her husband and two children. The impact also killed Soriano's 18–year–old passenger, Adolfo Lopez. Farmers soon offered its entire $20,000 policy limits[2] to the Medinas, who declined to take it, preferring to hire a lawyer and to investigate whether Soriano had other assets. The Medina survivors and the Lopez family later brought

separate suits against Soriano, which were consolidated in 1980 and brought to trial in 1981. Before the trial began, the Lopez family "Stowerized" Farmers by offering to settle for $5000. Farmers settled with them for $5000 and promptly offered the remaining $15,000 to the Medinas, who refused it. The jury found Soriano negligent and awarded the Medinas $172,000. This court affirmed the judgment. *Soriano v. Medina,* 648 S.W.2d 426 (Tex.App.—San Antonio 1983, no writ).

Soriano then assigned his excess-judgment action against Farmers to the Medinas;[3] in return, they signed a covenant not to execute against Soriano and agreed not to press the pending criminal charges against him (which included charges of involuntary manslaughter and DWI). Acting on behalf of the Medinas, Soriano brought this suit against Farmers. Soriano contended that Farmers breached its duty to exercise due care in settling claims against him, the insured; Farmers used $5000 of its $20,000 coverage to settle the lesser Lopez claim instead of using all $20,000 to settle the more substantial Medina claim. The jury found that Farmers was negligent in its handling of the *Medina* claim and that it breached its duty of good faith and fair dealing. Over Farmers' objection the court refused to ask the jury directly about Farmers' care or good faith in settling the *Lopez* claim, which also threatened Soriano with a judgment in excess of his policy limits.

## I. ELEMENTS OF CAUSE OF ACTION IN UNDERINSURANCE CASE.

Farmers contends that Soriano had to obtain a jury finding that the Lopez settlement was unreasonable when viewed on its own without reference to the Medina claim.

---

**2.** Soriano had coverage of $10,000 per person and $20,000 per occurrence.

**3.** On rehearing Farmers asks us to take judicial notice that Soriano did not really assign all of his rights to the Medinas. Farmers has presented a property settlement agreement (filed one day after the trial judge overruled Farmers' motion for new trial in this case) showing that Soriano and his former wife stated that they would share any proceeds from this case against

Farmers 50–50. The document does not reveal how much of the proceeds from the Farmers litigation they would receive, but that they would split it equally.

Under TEX.R.CIV.EVID. 201(f) and TEX. R.APP.P. 55(c), I would take judicial notice of the instrument and supplement the record with it because it helps portray more completely how this bad faith case was structured.

Farmers argues that it acted properly in accepting the Lopez family's reasonable $5000 settlement offer, which reduced its per-occurrence limits to $15,000, and that it then discharged its duty to Soriano by promptly offering the remaining $15,000 coverage to the Medinas.

I agree with Farmers that the law required Soriano to establish that the Lopez settlement was made in bad faith, and that it is not enough to show that the Medina claims were more serious than that of the Lopez family, and that all the coverage should have been devoted to them. I would hold that because there is no evidence that the Lopez settlement was made in bad faith, when viewed by itself, there is no proof of a cause of action.

### A. Preservation of Error.

The majority holds that Farmers waived this argument by not properly objecting to the charge. In truth, Farmers preserved the issue for review in this court in two separate ways.[4]

First, Farmers objected to the court's failure to submit an issue or instruction on the reasonableness of the Lopez settlement. During the charge conference, Farmers' attorney said this about jury question one:

MR. LEON (counsel for Farmers): ... [T]he problem I have with special issue number 1 is, it doesn't address the central issue of this lawsuit and that is the settlement of the Lopez claim. It only addresses the settlement of Maria Medina and Carlos Medina.

THE COURT: Okay.

MR. LEON: And nowhere in the charge does it address the central issue of this case that we spent five days on that and that is the settlement of the Lopez claim

where the expert testimony has been on and all that.

Later during his formal objections, Farmers' attorney repeated his objection to the court's failure to ask the jury anything about the Lopez settlement in question one:

MR. LEON: ... The entire case with respect to how the claims handling was handled and all the [expert] opinions address the issue of whether or not the Lopez claim should have been settled or not. [At this point counsel referred briefly to the evidence.] That's what the evidence is. And to submit the issue as stated is contrary to the evidence and contrary to the pleadings and the theory that this case has been tried on. For those reasons the Defendant, Texas Farmers Insurance Company, objects to the submission of special issue number 1.

Farmers' first point of error in this court complains of the court's refusal to ask about the Lopez settlement. Farmers did not waive this error.

Second, Farmers also properly preserved this no-evidence attack on the verdict and judgment by moving to disregard the answers to questions one and three, and also by moving for judgment n.o.v. Those motions preserve error without regard to objections to the charge. *See Cecil v. Smith,* 804 S.W.2d 509, 510–11 (Tex.1991); *Aero Energy, Inc. v. Circle C Drilling Co.,* 699 S.W.2d 821, 822 (Tex.1985).[5] An objection to the charge is not a predicate for preserving a no-evidence point by motion to disregard or motion for judgment n.o.v. "A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after verdict, regardless of whether the submission of such question was requested by the complainant." TEX. R.CIV.P. 279. *See also* TEX.R.CIV.P. 301

---

4. The majority is incorrect in saying Farmers' argument about the elements of the cause of action is *unassigned.* In addition to preserving the error in the trial court, Farmers assigned it in this court: its points of error and argument are adequate, and its brief contained photocopies of several of the cases cited in this dissent.

5. In *Aero Energy* the court said: "No evidence points must be preserved through *one* of the

following procedural steps in the trial court: (1) a motion for instructed verdict; (2) a *motion for judgment notwithstanding the verdict;* (3) an objection to the submission of the issue to the jury; (4) a *motion to disregard the jury's answer to a vital fact issue;* (5) a motion for new trial." 699 S.W.2d at 822 (emphasis added). *Cecil v. Smith* reaffirmed this principle. 804 S.W.2d at 510–11.

(authorizing post-verdict motions for judgment n.o.v. and to disregard jury answers).

A no-evidence point should be sustained when the record discloses a complete absence of a vital fact. *Cecil v. Smith,* 804 S.W.2d at 510 n. 1; *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990). In my view there is no evidence of the elements of a cause of action—as the out-of-state authorities define it and as Texas should define it—and the trial court should have granted judgment n.o.v. It is true that if I am correct about the law, the court should have submitted the case with different jury instructions. But that does not affect Farmers' right to move to disregard answers or to move for judgment n.o.v. The majority is simply incorrect in saying that Farmers could not urge for the first time after verdict that there is not legally sufficient evidence of all the elements of a cause of action. The majority and perhaps Justice Biery seem concerned that my research has gone a bit beyond what was presented to the trial court. There is, of course, no legal rule that restricts the objecting party or the court of appeals to the legal authorities that were cited to the trial court. The fact is that Farmers preserved its arguments; it properly objected to the charge, moved for judgment n.o.v. and to disregard jury answers, and brought forward the same complaints to this court by point of error and argument.

### B. Cause of Action in Underinsurance Case.

This case differs from the usual *Stowers* case in two ways: the *adequacy* of the insurance coverage purchased, and the insurer's *willingness to offer* that coverage in settlement. (1) In the ordinary *Stowers* case, the insured bought enough insurance to pay the settlement demands of the persons he injured; here Soriano did *not* buy enough insurance to settle the two wrongful death claims and the three personal injury claims against him. (2) In the ordi-

nary *Stowers* case the insurer was not willing to pay its policy limits to settle and thereby avoid exposing its insured to an excess judgment; here Farmers *was* willing to pay its full coverage to settle but that amount was not enough to settle all claims.[6]

This distinguishes the case from *Ranger County Mutual Insurance Co. v. Guin,* 723 S.W.2d 656 (Tex.1987), which was not an underinsurance case. There the supreme court upheld a broad-form jury submission about negligent "handling" of a claim, which the trial court in this case clearly used as a pattern. The court in *Guin* approved the jury charge "in a case of this type." *Id.* at 660. *Guin* involved an ordinary *Stowers* situation of adequate insurance. Broad-form submission contemplates that instructions (and the proof required to show negligence and bad faith) will vary when the substantive law that sets the standard of care varies—as it should when the case involves underinsurance and not a refusal to offer adequate insurance coverage.

Soriano does not contend that the Lopez settlement was made in bad faith when viewed alone. He argues that it was unreasonable because the Medina cases were more serious and posed a greater threat to him. In his view, an insurer can be held liable even though the first settlement was reasonable and entered in good faith when viewed apart from the exposure in the second case. The premise of his lawsuit is that an insurer must assess the proportionate merits of each claimant that its insured injured, and settle the cases accordingly. If its assessment is later considered wrong by a court, the insurer is liable beyond the policy limits.

But Soriano's theory is contrary to the universal rule that a liability insurer can settle with some claimants in good faith even though the settlement may exhaust the insurance fund or so deplete it that a subsequent judgment creditor is unable to

---

**6.** In a case similar to our own, the court made essentially the same point: "Most 'bad faith' cases involve an insurance company's refusal to accept an offer of settlement within the avail-

able policy limits—a state of affairs (unlike this one) where the interests of the carrier and insured are clearly opposed." *Voccio v. Reliance Ins. Co.,* 703 F.2d 1, 2 (1st Cir.1983).

collect his judgment in full from the remaining insurance coverage. *See* Annotation, *Basis and Manner of Distribution Among Multiple Claimants of Proceeds of Liability Insurance Policy Inadequate To Pay All Claims in Full*, 70 A.L.R.2d 416, 417 (1960); 8A APPLEMAN, INSURANCE LAW AND PRACTICE § 4892 (1981); S. ASHLEY, BAD FAITH ACTIONS—LIABILITY AND DAMAGES § 4:18 (1984); 15A COUCH ON INSURANCE § 56:35 (1983 rev.); 3 R. LONG, THE LAW OF LIABILITY INSURANCE §§ 21.01–21.06; *Voccio v. Reliance Ins. Co.*, 703 F.2d 1, 3 (1st Cir.1983); *Harmon v. State Farm Mut. Automobile Ins. Co.*, 232 So.2d 206, 207–208 (Fla.Ct.App.1970); *Haas v. Mid America Fire & Marine Ins. Co.*, 35 Ill. App.3d 993, 343 N.E.2d 36, 38 (1976); *Castoreno v. Western Indem. Co.*, 213 Kan. 103, 515 P.2d 789, 792–95 (1973); *Holtzclaw v. Falco, Inc.*, 355 So.2d 1279, 1283–87 (La.1978) (opinion on rehearing); *Liguori v. Allstate Ins. Co.*, 76 N.J.Super. 204, 184 A.2d 12, 15–17 (1962); *Negron v. Eveready Ins. Co.*, 53 A.D.2d 815, 385 N.Y.S.2d 87, 88 (1976); *Duprey v. Security Mut. Cas. Co.*, 22 A.D.2d 544, 256 N.Y.S.2d 987, 989 (1965); *Alford v. Textile Ins. Co.*, 248 N.C. 224, 103 S.E.2d 8, 13 (1958); *Scharnitzki v. Bienenfeld*, 368 Pa.Super. 610, 534 A.2d 825, 827 (1987).

The settlement with one claimant reduces the policy limits by the settlement amount:

> Occasionally, liability insurers have in good faith settled with some claimants and by so doing have reduced the available insurance proceeds to an amount inadequate to pay, in full, judgments subsequently obtained by other claimants. In such cases, the courts have generally held that the insurer was liable to the judgment creditors only for the amount that its total liability exceeded the settlements made.

Annotation, *supra*, 70 A.L.R.2d at 423. Farmers was entitled to rely on this rule.

We have not been cited any cases adopting and applying the comparative-seriousness rule that Soriano urges and the majority implicitly adopts. In fact, in most of the cases cited the claimant sought only a *pro rata share* of the available insurance money; here the Medinas sought *all* of it. The general rule means that the jury must focus on whether the first settlement was made in bad faith—not whether there was bad faith generally in handling all the claims against the insured. If the jury fails to find that the insurer made the first settlement in bad faith, then the amount of that settlement payment is subtracted from the per-occurrence policy limits, and the reduced amount becomes the policy limits for the remaining claims.

There are sound reasons for the general rule, which permits the insurer to settle some claims even if that makes settlement with other claimants more difficult, or impossible. To begin with, the insurer has a duty to the insured to use care in handling *all* claims against him. An insurer that rejects any reasonable settlement offer within its policy limits—such as the Lopez $5000 offer—risks a *Stowers* suit. *See Voccio v. Reliance Ins. Co.*, 703 F.2d at 3 (had carrier refused to settle with first claimant, insured might have faced two excess-judgment suits rather than one, or suit by first claimant instead of second); *Davis v. Liberty Mut. Ins. Co.*, 412 F.2d 475, 480–81 (5th Cir.1969) (Wisdom, J.) (insurer should settle *some* claims if it cannot settle *all* of them because of underinsurance; insurer that rejected first claimant's offer held liable for excess judgment). "[A] few cases at least suggest that an insurer cannot escape liability for bad faith by arguing that it rejected one claimant's reasonable policy limits settlement offer to conserve a fund to settle with other claimants." ASHLEY, *supra*, § 4:18, at 49. In other words, if Farmers had not settled with Lopez, and Lopez had gotten a judgment for more than $10,000, Soriano would have had a *Stowers* suit against Farmers for failure to settle within its policy limits with Lopez. Apparently the majority is not prepared to say otherwise, which means that Farmers would have faced an excess-judgment suit regardless of whether it had settled with the Medinas first, with the Lopezes first, or with neither.

The general rule is also sound because it facilitates settlements. The law favors set-

tlements. *See Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 4 (Tex.1986); *McGuire v. Commercial Union Ins. Co.*, 431 S.W.2d 347, 352 (Tex.1968). And settlements in multi-claimant cases involving underinsurance would be severely curtailed if an insurer acted at its peril by settling one of several claims.

If an underinsured tortfeasor's insurer cannot accept a reasonable settlement offer from one of several claimants, I question whether a reasonable insurer acting in good faith has any safe course of action. The prudent insurer simply cannot wait until *all* claimants are willing to settle because some of the claimants might never agree about how to split the limited, inadequate insurance money. Indeed, if the insurer waits for *each* claimant to agree, that might expose the insured to *several* excess judgments instead of only one. Here, for example, if Farmers had refused to settle with the Lopez family, Soriano would have had to defend two suits instead of one, and Farmers might have faced two excess-judgment suits instead of one. There is no evidence—indeed, no suggestion—that the Medinas would have settled for anything less than the full $20,000. The majority holds that if an insurer does not pay *all* its policy limits to the most seriously injured group of claimants (as determined by a jury years later), it can be held liable for any excess judgment that they recover.

In recent years, lectures at continuing legal education programs have offered advice on how to "set up" the insurance carrier. The majority's opinion permits such set-ups to happen in many cases, and lawyers representing their clients zealously within the bounds of the law will take note.

Under the comparative-seriousness rule, in cases of underinsurance involving three or more claimants, any lawyer representing two or more of them could often set up an excess-judgment suit for his clients. In a case of $10,000/20,000 limits, for example, the attorney would simply have to demand the entire $20,000 and refuse to settle for less. If the insurer paid the $20,000 to *A* and *B*, there would be no money left for the remaining claimant (*C*), and the insurer would be potentially liable for whatever judgment *C* recovered. On the other hand, if the insurer paid anything in settlement to *C* (as Farmers paid to Lopez), *A* and *B* could refuse to settle for the remaining coverage (as the Medinas did in this case) and pursue their claims to judgment, eventually bringing an excess-judgment suit after the insured assigned his cause of action to them. Either way—settlement with *A* and *B*, or settlement with *C*—even the most reasonable of insurers would face a possible excess-judgment suit, which it could not win as a matter of law.[7]

Thus the comparative-seriousness rule would inhibit settlements by (1) making it risky for insurers to settle with one but less than all claimants, and (2) motivating multiple claimants faced with an underinsured tortfeasor to jockey for an excess-judgment suit. We must remember that an attorney for claimants seriously injured by an underinsured tortfeasor will cast about for ways to obtain a judgment against someone with assets—here, the carrier. And under our ethical rules can advocates be faulted for trying to structure their lawsuits for full collection, to the extent the cases allow it?[8]

---

7. The words of Justice Spears, written in a somewhat different context, ring true in this case:

> Insurers are now faced with a Hobson's choice. If they settle claims promptly, they are not protected from the later assertion of unknown claims. If they refuse to settle until all injuries are known, then they face potential liability under a bad faith claim.

*Williams v. Glash*, 789 S.W.2d 261, 266 (Tex. 1990) (Spears, J., dissenting).

8. Prior to September 1, 1991, Canon 7 stated, "A Lawyer Should Represent a Client Zealously Within the Bounds of the Law." *See* State Bar Rules, 3 TEX.GOV'T CODE ANN., Title 2, Subtitle G, art. 10, § 9, at 487ff. (Vernon 1988). Effective September 1, 1991, rule 3.01 states, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous." The comment says, "The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure. The law, both procedural and substantive, affects the limits within which an advocate may proceed." *Id.* at 154 (Vernon Supp. 1992).

The majority suggests that the insurer might avoid this Hobson's choice by interpleading its policy limits into court, for distribution by the court.[9] But the majority does not say that interpleading all the policy limits would end the insurer's liability as a matter of law or end the insurer's duty to protect its insureds' interest. Even if Farmers had interpleaded the $20,000 and the trial court had allowed it, that would not have solved Soriano's underinsurance problem. Farmers' had a duty to try to protect its insured, not simply to interplead and turn things over to the insured. Here the claimants did not simply seek a finite common fund; they sought unliquidated damages from the tortfeasor in excess of the $20,000 fund of insurance coverage. The Medinas wanted all of the fund, and the Lopez family wanted some of it.

Interpleader does not solve that kind of predicament. It accomplishes nothing at all unless there is a settlement or a trial, because the claimants are claiming more than the interpleaded funds. Interpleader does not settle the various tort cases unless all claimants agree on how to distribute the limited funds. And certainly the court could not deny litigants a jury trial and parcel out the interpleaded insurance coverage without a settlement agreement. The claimants have a right not to take the limited insurance money, but instead to take an excess judgment against the insured and try to collect it. Unless there is a settlement, interpleading the policy limits into court simply does not change the fact that there would have to be a trial. The general rule is that after such a trial the court should distribute the limited funds proportionately among the claimants, according to the percentage of damages suffered in comparison to the whole. *See* Couch, *supra*, § 56:35; Annotation, 70 A.L.R.2d at 416, 417, 418–19 (1960 & Supp.). Nevertheless, after such a pro rata distribution, the insured would still face *several* excess

judgments instead of *one*, as in the present case. An insurer that interpleaded its policy limits in a multiple-claimant case, as the majority recommends, was held liable for an excess judgment in *Farmers Insurance Exchange v. Schropp*, 222 Kan. 612, 567 P.2d 1359 (1977). Interpleader "merely passes the buck from the insurer to the court and provides little protection for the insured." ASHLEY, *supra*, § 4:18, at 48.

The majority's interpleader discussion might not ring so hollow if it cited authorities for its assumption that interpleader would have removed Farmers' excess-judgment liability. Interpleader simply would not have defeated this excess-judgment suit, unless the *Stowers* and bad faith rules are to be changed. That is beyond this court's power.

I would apply the general rule to give the insurer considerable—but not unlimited—discretion to decide whether to settle *some* claims when it cannot settle *all* of them. I agree that the insurer should not have absolute freedom to settle away the insurance coverage to the detriment of its insured. I would hold that an insured who suffers an excess judgment in a case like this one may hold the insurer liable by establishing that (1) its settlement in the first case, viewed on its own, was made in bad faith, and (2) the settlement caused harm to the insured. *See Voccio v. Reliance Ins. Co.*, 703 F.2d 1, 2–3 (1st Cir. 1983); *Haas v. Mid America Fire & Marine Ins. Co.*, 35 Ill.App.3d 993, 343 N.E.2d 36, 38 (1976); *Liguori v. Allstate Ins. Co.*, 76 N.J.Super. 204, 184 A.2d 12, 17 (1962); 8A APPLEMAN, INSURANCE LAW AND PRACTICE § 4892, at 42–45 (1981); 15A COUCH ON INSURANCE § 56:35 (1983 rev.).

The second element requires proof that if the insurer had settled with the first tortfeasor for a smaller, more reasonable

9. The majority and Justice Biery appear to be incorrect when they state that Farmers' lawyer (Auforth) advised Farmers to interplead the policy limits. In fact, Auforth's letters to Farmers say he is considering advising interpleader and wants to explore it. Auforth's two letters to Farmers on this point say: "We are considering the advisability and/or methods of tendering policy limits into the registry of the court...." and "I wish to explore with you the advisability of stipulating negligence on one count on the part of our insured, tendering policy limits into the registry of the Court...."

amount, the second tortfeasor would have accepted the money remaining:

> Before one of several claimants may recover damages for the insurer's bad faith in settling with other claimants, the plaintiff must prove that the insurer's settlement decisions actually caused harm to the plaintiff. If the plaintiff would not have settled for anything less than the full policy limits, then the insurer's decision to settle with another claimant could not have harmed the plaintiff if the insurer, even acting in good faith, would still have settled with the other claimant for some amount greater than zero.

ASHLEY, *supra*, § 4:18, at 51 (citing *Voccio v. Reliance Ins. Co.,* 703 F.2d at 3–4). The evidence in this case is that even if Farmers had settled with the Lopez family for a nominal amount (perhaps $500, or less), the Medinas would not have settled for the remainder. They wanted all $20,000.

To summarize, in cases involving multiple claimants and inadequate insurance, the comparative-seriousness rule would frustrate settlements and promote trials in two ways. It would encourage *claimants* to insist that all the policy limits be paid to them and to position themselves for an excess-judgment suit. It would also make settlements risky for *insurers* in cases of underinsurance and multiple claimants because whenever the insurer settled with one claimant, the other could always bring an excess-judgment suit. The rule would also place added burdens on the legal system. With insurers unable to settle multiple claims safely, and with multiple claimants motivated by the law to solve their underinsurance problem by jockeying for an excess-judgment suit, the underlying tort suit would often proceed to trial and judgment, followed by an additional round of excess-judgment litigation.

For the reasons stated, I think the general rule followed in other states and confirmed in the treatises is sound, and I would apply it.

### C. Application of Rule to this Record.

Applying the rule to the record before us, I note that Soriano sought to show only

that the Medina claims were more serious than the Lopez claim; he did not produce evidence that the Lopez claim itself was not worth $5000 or that Farmers acted in bad faith in settling with the Lopez family. There is evidence that the value of the Medina cases exceeded that of the Lopez case, but no evidence that the Lopez settlement was made in bad faith under the no-evidence standard of review stated in *Garza v. Alviar,* 395 S.W.2d 821 (Tex. 1965).

The majority points out that the Lopez and Soriano families were friends, and that the Lopez family might not have pursued the case to trial if Farmers had not settled with them. But I do not regard friendship of the parties as evidence that Farmers acted in bad faith. The Lopez family was dealing with an insurance company; they knew that Soriano had insurance coverage and that for the first $10,000 he would not pay any judgment.

Nor was the Lopez suit against Soriano a trivial, nuisance-value suit. On the contrary, it was a wrongful-death case in which all the evidence showed conclusively that Soriano hit the Medinas head-on in their lane on a wet two-lane highway while he was passing on a hill and exceeding the speed limit. The Lopez family had pleaded gross negligence, and, to put it mildly, the evidence certainly raised a fact issue on that allegation. There being no evidence of joint enterprise, Soriano's negligence could not be imputed to Lopez simply because he was a passenger. *See Shoemaker v. Estate of Whistler,* 513 S.W.2d 10 (Tex.1974); *Robinson v. Ashner,* 364 S.W.2d 223, 225 (Tex.1963). There is no evidence that the $5000 settlement by itself was an act of bad faith, and Soriano does not contend that there is. The amounts of reserves that Farmers allocated for each claim do not constitute evidence that the Lopez settlement was negotiated in bad faith. Loss reserves are amounts the board of insurance requires companies to estimate and show on the books as potential liabilities for claims incurred but not yet paid.

There is also no evidence that the Lopez settlement proximately caused any harm to Soriano. There is no suggestion that if Farmers had settled with the Lopez family for a smaller amount—for example, $500—that the Medinas would have settled for the remainder. On the contrary, all the evidence shows that the Medinas insisted on receiving every bit of the $20,000.

The facts of this case, when coupled with the no-evidence standard of review, illustrate the unfairness of the approach Soriano advocates and the majority apparently adopts. Under the no-evidence standard, we consider only the evidence supporting the verdict and disregard all evidence and inferences to the contrary. *See Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). Administered together, the no-evidence appellate standard and the comparative-seriousness rule would frequently make it impossible for a reasonable insurer acting in good faith to avoid excess-judgment litigation in underinsurance cases involving several claimants.

The majority simply applies the no-evidence standard of review and upholds the liability findings before us. Farmers is held liable for failing to settle with the Medinas because when the majority viewed the evidence favorably to the verdict and disregarded all evidence to the contrary, the evidence is legally sufficient to support the jury's liability findings. There is evidence, viewed favorably to the verdict, that the Medina cases had significantly greater verdict value than the Lopez case.

But if Farmers had followed the option the majority recommends and had settled with the Medinas and turned down the Lopez family's $5000 offer, those same principles—the comparative-seriousness rule and the no-evidence standard—would result in liability. If Farmers had settled with Lopez, the appellate court would be considering completely different evidence, because on appeal we consider the evidence and inferences that support the jury's findings, not the evidence that might have supported contrary findings.

If Farmers had settled with the Medinas, in all likelihood Lopez would have recovered a judgment against Soriano, who would then have assigned to the Lopez family his excess-judgment action against Farmers. If the jury had found the facts in favor of Soriano, under the no-evidence standard we would disregard such evidence as the Lopez–Soriano friendship and the greater value of the Medina cases; instead, under the no-evidence standard we would consider only the evidence that Farmers should have settled with the Lopez family. We would observe that the Lopez family had persisted in their suit from 1979 to 1981, and had pleaded gross negligence. Undoubtedly there would be evidence that the Lopez family's lawyer had told them that they could seek an excess judgment against Soriano, give him a covenant not to execute against his personal assets in return for his excess-judgment action against Farmers, and that Soriano personally would never pay a dime. In other words, under the no-evidence standard we would credit the evidence that the Lopez family was well aware that the case could have been structured (or "set up") for collection from Farmers and that nothing required them to pursue their friend Soriano individually. There would, of course, be evidence that Farmers knew that the Lopez suit threatened Soriano when it refused to settle with the Lopez family and thereby exposed Soriano to an excess judgment.

There is still other evidence that we would review under this scenario, which is the alternative the majority says Farmers should have followed. Lopez lived a short time before he died and undoubtedly experienced some conscious pain and suffering, which added to the special damages of $2400 and other damages his parents claimed for the wrongful death of their 18–year–old son. Soriano's own expert said the Lopez case could possibly have yielded a verdict of $100,000. All this evidence would be legally sufficient to support a jury finding that Farmers was negligent in handling the Lopez claim because it settled the Medina cases instead of the Lopez case. Under the no-evidence standard of appellate review, we would not be able to consider any evidence that the Medina claims were more serious than the Lopez claim,

which is the evidence that Soriano stresses in this appeal.

Thus, under the comparative-seriousness rule each of Farmers' two options—settling with the Lopez family, or settling with the Medinas—could have resulted in excess-judgment liability. No matter which set of claimants Farmers settled with, it faced a potential excess-judgment suit in which the evidence raised a fact issue of negligence for the jury, and the jury's decision would be upheld on appeal.

The law properly does not impose this "lose-lose" burden on the insurer. And it does not provide such an easy exit for an insured who caused the problem in the first place by underinsuring and then causing vast damage beyond his insurance coverage. *See Steele v. Hartford Fire Ins. Co.,* 788 F.2d 441, 446 (7th Cir.1986) (Posner, J.) ("Why an insurer should be thought voluntarily to assume a duty whose faithful fulfillment can only encourage people to underinsure is not clear to us").

I would sustain Farmers' points one through three, reverse, and render a take-nothing judgment. Rendition is proper instead of remand because the trial court omitted an element of the cause of action over Farmers' objection. *Texas Dep't of Highways & Public Transp. v. Payne,* 838 S.W.2d 235, 240–41 (Tex.1992); *Morris v. Holt,* 714 S.W.2d 311, 312–13 (Tex.1986).

## II. EXEMPLARY DAMAGES.

Farmers' point ten challenges the legal and factual sufficiency of the finding of $5 million in exemplary damages. Point eleven contends that the exemplary damages award violates due process and equal protection and asks for remittitur. The majority has suggested a remittitur of $4.0 million. Justice Biery suggests $4,750,000. I

think that no exemplary damages should be recoverable on these facts, and that in any event existing state and federal standards require that we engage in more searching and meaningful review and that the entire award should fall.

The Supreme Court in *Pacific Mutual Life Insurance Co. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), rejected the notion that exemplary damages are per se unconstitutional. The Court also upheld Alabama's system as consistent with due process. But the court made clear that due process requires genuine review of exemplary damage awards.[10]

I think the Texas procedures for reviewing exemplary damage awards—certainly as applied by the majority—do not satisfy *Haslip.* I would interpret existing precedents to require genuine appellate review of the *reasonableness* of exemplary damage awards. In *Alamo National Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981), the court directed that appellate review proceed along these lines:

Exemplary damages must be reasonably proportioned to actual damages. There can be no set rule or ratio between the amount of actual and exemplary damages which will be considered reasonable. This determination must depend upon the facts of each particular case. Factors to consider in determining whether an award of exemplary damages is reasonable include (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety.

---

**10.** *Haslip*'s fact-specific approach has been summarized as follows:

*Haslip* made it clear that a punitive damages award with a four-to-one ratio to compensatory damages awarded by [1] a well-instructed jury, [2] reviewed post-trial by the trial court, and [3] given a thorough appellate review would *satisfy* due process. But the court's fact-specific opinion did not give much guidance as to what procedures would *violate* due process. Would the *Haslip* procedures have

satisfied due process if the award had a 10-to–one punitive to compensatory damages ratio? Or if there had been post-trial but not appellate review? Or if the jury instruction had failed to enumerate all of the policy considerations in an award of punitive damages? The court prescribes a case-by-case analysis that does not answer those questions.
Jane Webre, *Due Process Constraints on Punitive Damage Awards: Are There Any?,* 55 TEX.B.J. 14, 18–19 (1992) (emphasis added).

Whether the amount of damages awarded by the jury is excessive is a question of fact....

*Id.* at 910 (citations omitted).

Under *Kraus* there is no set ratio; the facts of each case must be evaluated, using the *Kraus* factors. The supreme court has recently stressed that the reasonable relationship rule is "merely a tool" to aid in determining whether the damages are reasonable, which requires consideration of the *Kraus* factors. *Wright v. Gifford–Hill & Co.*, 725 S.W.2d 712, 714 (Tex.1987). The reviewing court is to use the *Kraus* factors in determining whether the exemplary damages are reasonably related to the actual damages. *See Tatum v. Preston Carter Co.*, 702 S.W.2d 186, 188 (Tex.1986).

It would make no sense to conduct a factual-sufficiency review for evidence of the *Kraus* factors. For one thing, each factor does not have to be present. *Kraus* refers to its list as "[f]actors to consider in determining whether an award of exemplary damages is reasonable," not elements that must be proved in every case. It seems clear from *Haslip* that our courts must conduct independent review under *Kraus* and possibly using other factors mentioned in *Haslip*, not merely factual sufficiency review.

*Haslip* said several things that suggest *real and meaningful review* is required as a matter of federal due process. The *Haslip* Court began by indicating its concern about unbridled punitive damages:

> Under the traditional common-law approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. *The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable....*
>
> ....

... We note again our concern about punitive damages that "run wild." ...

> One must concede that unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities....

— U.S. at ——, ——, 111 S.Ct. at 1042, 1043, 113 L.Ed.2d at 18, 20 (emphasis added). The Court then reviewed Alabama's procedures and upheld the award. But it upheld the award because Alabama has post-trial and appellate procedures for review that Texas does not have.

First, the court reviewed the Alabama *jury instructions*, which are similar to our own. "As long as the discretion is exercised within reasonable constraints, due process is satisfied." *Id.* at ——, 111 S.Ct. at 1044, 113 L.Ed.2d at 21. The majority seems to think this ends the appellate *Haslip* analysis, but that ignores the rest of the Court's opinion in *Haslip*.

Second, the court emphasized Alabama's *post-trial* procedures, which stand in stark contrast to the lack of post-trial review in this case. Trial courts in Alabama must state reasons for modifying *or not modifying* the jury award. They are told to consider several listed factors, not simply to defer to the jury if the evidence is factually sufficient or if the evidence seems to satisfy the vague *Kraus* factors. *See Haslip*, — U.S. at ——, 111 S.Ct. at 1044, 113 L.Ed.2d at 21. The Alabama procedure "ensures meaningful and adequate review by the trial court." *Id.* In contrast, there is no indication that the trial judge reviewed this verdict for reasonableness under *Kraus* or even for factual sufficiency. On the contrary, the trial court overruled Farmers' post-trial motions in a perfunctory two-sentence order.[11] The trial judge can hardly be faulted for not making findings of fact about the reasonableness of the exemplary damages because the trial

---

11. "On this day the court heard the posttrial motions filed by the defendant, Texas Farmers Insurance Company. After considering the defendant's motion for judgment notwithstanding the verdict, motion to disregard jury findings, motion for new trial or for suggestion of remittitur, and motion to modify, correct, or reform the judgment, the Court OVERRULES those motions."

occurred before *Haslip* and the Texas rules do not contemplate findings of fact and conclusions of law on issues submitted to a jury. *See* TEX.R.CIV.P. 296.

Third, the *Alabama Supreme Court* itself undertakes further review. "By its review of punitive awards, the Alabama Supreme Court provides an additional check on the jury's or trial court's discretion. It first undertakes a comparative analysis.... It then applies the detailed *substantive standards* it has developed for evaluating punitive awards." *Id.* at ——, 111 S.Ct. at 1045, 113 L.Ed.2d at 21–22. "This appellate review makes certain that the punitive damages are [1] *reasonable in their amount* and [2] *rational in light of their purpose* to punish what has occurred and to deter its repetition." *Id.* The Court then summarized Alabama's appellate standards, which seem to me more useful and concrete than the Texas *Kraus* factors:

> (a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; [12] (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other

civil awards against the defendant for the same conduct, these also to be taken in mitigation.

> *Id.*

These appellate standards, said the Court, have a real impact. "The application of these standards, we conclude, imposes a sufficiently *definite and meaningful constraint on the discretion* of Alabama fact finders in awarding punitive damages. The Alabama Supreme Court's post-verdict review ensures that punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages.... These standards have *real effect* when applied by the Alabama Supreme Court to jury awards." *Id.*, at ——, 111 S.Ct. at 1045, 113 L.Ed.2d at 22 (emphasis added).

At the end of its opinion, the *Haslip* Court restated that the punitive damages award did not deny due process because Pacific Mutual "had the benefit of the *full panoply* of Alabama's procedural protections": adequate jury instructions, post-verdict hearing and fact findings by the trial court, and review under specified standards by the Alabama Supreme Court. *Id.* at ——, 111 S.Ct. at 1046, 113 L.Ed.2d at 23 (emphasis added).

The Court then said,

> We are aware that the punitive damages award in this case is more than 4 times the amount of compensatory damages.... While the monetary comparisons are wide and, indeed, may be close to the line, the award here did not lack objective criteria. We conclude, after careful consideration, that in this case it

---

12. The Supreme Court's mention of this factor is puzzling because the Court also noted, "Any evidence of Pacific Mutual's wealth was excluded from the trial in accord with Alabama law." —— U.S. at ——, 111 S.Ct. at 1044, 113 L.Ed.2d at 21. The Court elsewhere noted,

> While punitive damages in Alabama may embrace such factors as the heinousness of the civil wrong, its effect upon the victim, the likelihood of its recurrence, and the extent of defendant's wrongful gain, *the fact finder*

*must be guided by more than the defendant's net worth.* Alabama plaintiffs do not enjoy a windfall because they have the good fortune to have a defendant with a deep pocket.
*Id.* at ——, 111 S.Ct. at 1045, 113 L.Ed.2d at 22. *Cf. Lunsford v. Morris*, 746 S.W.2d 471 (Tex. 1988) (allowing discovery of defendant's net worth when exemplary damages are sought).
In this case the jury was told that Farmers received $53,000,000 in *premiums* in 1987.

does not cross the line into the area of constitutional impropriety.

*Id.*

Unlike the appellate review in Alabama, our courts generally do not make a comparative analysis, and this court has not made any real review. Although the reduction of $4,000,000 may seem significant, I find no reason why Farmers should be punished at all. This court has done better than most Texas appellate courts, but it cannot be seriously argued that post-verdict review in Texas approaches that of Alabama. Consider the perfunctory analyses of the courts of appeals in *Commonwealth Lloyds Ins. Co. v. Thomas*, 825 S.W.2d 135, 149 (Tex.App.—Dallas 1992, writ filed); *Dearing Inc. v. Spiller*, 824 S.W.2d 728 (Tex.App.—Fort Worth 1992, writ filed); *Transmission Exchange Inc. v. Long*, 821 S.W.2d 265, 272–73 (Tex.App.—El Paso 1991, writ denied); *Investment Prop. Management, Inc. v. Montes*, 821 S.W.2d 691, 697 (Tex.App.—El Paso 1991, no writ); *LaCoure v. LaCoure*, 820 S.W.2d 228 (Tex.App.—El Paso 1991, writ denied); *Corpus Christi Teachers C.U. v. Hernandez*, 814 S.W.2d 195 (Tex.App.—San Antonio 1991, no writ); *Bard v. Charles R. Myers Ins. Agency*, 811 S.W.2d 251 (Tex.App.—San Antonio 1991, writ granted); *Owens v. Watson*, 806 S.W.2d 871 (Tex.App.—Corpus Christi 1991, writ denied); *Cheek v. Humphreys*, 800 S.W.2d 596 (Tex.App.—Houston [14th Dist.] 1990, writ denied); *Beacon Nat'l Ins. v. Reynolds*, 799 S.W.2d 390 (Tex.App.—Fort Worth 1990, writ denied); *Lawson–Avila Constr. v. Stoutamire*, 791 S.W.2d 584 (Tex.App.—San Antonio 1990, writ denied); *Miles Homes Div'n, Insilco Corp. v. Smith*, 790 S.W.2d 382 (Tex.App.—Beaumont 1990, writ denied).

The majority mentions with apparent approval the "passion and prejudice" language of some earlier cases, an appellate standard that *Haslip* rejected as constitutionally inadequate. In a significant footnote, the *Haslip* Court said that Alabama's post-trial procedures set it apart from "the Vermont and Mississippi schemes about which Justices expressed concern" in 1988 and 1989. In Vermont an award would be set aside only if it was "manifestly and grossly excessive." In Mississippi an award would be set aside only if "it evinces *passion, bias and prejudice* on the part of the jury so as to shock the conscience." *Id.* at —— n. 10, 111 S.Ct. at 1045 n. 10, 113 L.Ed.2d at 22 n. 10 (emphasis added). In other words, the Supreme Court came very close to saying the Vermont and Mississippi standards are constitutionally inadequate. I think it is improper to cite "passion and prejudice" cases.

Soriano's motion for rehearing seems to assume that appellate review of exemplary damage awards involves mere canvassing of the liability facts. But that kind of review could not satisfy *Haslip*. Under the *Kraus* and *Haslip* factors I note that (1) Farmers did not *profit* by its settlement with Lopez for $5000; it offered its $20,000 policy limits soon after the accident and again before trial. As mentioned in *Haslip*, there is simply no wrongful profit to remove or disgorge. (2) Concerning *harm* to Soriano, there is evidence that he suffered a larger judgment in favor of the Medinas than he would have from the Lopezes. But in view of his underinsurance and the harm that his negligence caused, he would have suffered an excess judgment in any event. And all or most of the existing harm was removed when the Medinas gave him the covenant not to execute. See part 3 of this opinion. (3) Farmers' conduct certainly was not *reprehensible* or of *long duration*, nor was it *concealed*.

The majority also mentions the testimony of Farmers' representative that even if the jury awarded $6 million, Farmers would handle the case the same way. The witness's full answer is "Yes, sir. We would handle it exactly the same way *because we did nothing wrong.*" That is not outrageous conduct that calls for punishment. The statement does not exhibit a defiant, unrepentant attitude about conduct the witness knew was wrong, as the majority seems to conclude.

A punitive award of any amount—even though Farmers offered all its policy limits shortly after the accident, Soriano was not really harmed, and whatever wrong Farm-

ers may have committed was not part of a pattern, done frequently, or concealed—shows vividly how far our system of exemplary damages is out of line with *Haslip*.

## III. DENIAL OF JURY DISCRETION IN ASSESSING DAMAGES.

The majority dismisses Farmers' complaint that the trial court in effect instructed a verdict for Soriano on actual damages.[13] The amount of damages is very much a jury question. To instruct a jury that it must assess a precise amount deprives litigants of a jury trial on that issue.

The Medinas gave Soriano a covenant not to execute against him and his assets; in return Soriano assigned to the Medinas his rights against Farmers. The instrument was not introduced, but Soriano testified about it.[14] The majority belittles this testimony, but there was no objection to it, and under the no-evidence standard it raised a fact issue for the jury whether Soriano's damages were the amount of the underlying judgment or something less. Farmers argues that the covenant not to execute minimizes or eliminates whatever damages the judgment causes Soriano, and that the court should have allowed the jury to find an amount less than the face amount of the judgment plus interest.

I disagree with the majority's rejection of that argument for the reasons I expressed in *Garcia v. American Physicians Insurance Exchange*, 812 S.W.2d 25, 36–42, 45 (Tex.App.—San Antonio 1991, writ granted) (Peeples, J., dissenting). An excess-judgment suit lies to remove whatever harm the judgment causes the insured, Soriano. *See Street v. Second Court of Appeals*, 756 S.W.2d 299 (Tex.1988); *Hernandez v. Great Am. Ins. Co.*, 464 S.W.2d 91 (Tex.1971). Here the covenant not to execute on Soriano's assets removed any harm the judgment caused him. A judgment that cannot be collected certainly does not injure the insured in the amount of the judgment as a matter of law, but that is the effect of the court's instruction in the damage issue. At the least, the court should have allowed the jury to decide whether the covenant reduced Soriano's actual damages.[15]

The majority says that juries must be given great discretion in assessing damages, but the charge gave the jury *no* discretion at all. It *required* the jury to award the amount of the excess judgment, plus interest, minus payments by Farmers. At the very least, the court should have instructed the jury that it could consider the covenant not to execute in assessing Soriano's damages.

It makes no difference that the covenant not to execute was signed after the original judgment, which always happens. Post-tort events—such as surgery and re-employment, to name just two—can reduce or eliminate one's damages. Here the cove-

---

13.
*Special Issue No. 9*
  What sum of money if now paid in cash would fairly and reasonably compensate Richard R. Soriano for his damages by reason of the trial in Webb County, Texas and the resulting excess judgment?
  Take into consideration the following elements of damages and none other.
  The difference between the excess judgment taken against Richard R. Soriano with interest to date, and the amount paid by Texas Farmers Insurance Co. toward satisfaction of such judgment.
  Answer in dollars and cents, if any.
  ANSWER: [$235,479.13]
  Mental Anguish in the past.
  Answer in dollars and cents, if any.
  ANSWER: [zero]

14. Soriano testified that he had assigned all his recovery in this case to the Medinas. The testi-

mony continued: "Q. In exchange for which you didn't have to worry about having to pay that judgment off any more. A. Correct."

15. This seems to be the holding in *William M. Mercer, Inc. v. Woods*, 717 S.W.2d 391 (Tex. App.—Texarkana 1986), *aff'd in part and rev'd in part on other grounds*, 769 S.W.2d 515 (Tex. 1988). In *Woods* the Texarkana court expressed disapproval of the notion that the underlying tort judgment proves damages as a matter of law. 717 S.W.2d at 399–401. It is therefore misleading for the majority to quote the *Woods* court's summary of *Allstate Ins. Co. v. Kelly*, 680 S.W.2d 595 (Tex.App.—Tyler 1984, writ ref'd n.r.e.), as though the *Woods* court agreed with *Kelly*. *See Garcia v. American Physicians Ins. Exch.*, 812 S.W.2d at 41–42, 45 (Peeples, J., dissenting).

nant not to execute eliminated, and certainly reduced, Soriano's damages.

Farmers properly objected to the damage issue on this ground.[16] I would sustain point six and reverse and remand.

\*    \*    \*    \*    \*    \*

For the reasons stated in section one, I would reverse and render judgment that Soriano take nothing from Farmers for failure to prove an element of the bad faith cause of action (unreasonableness of the Lopez settlement) in this underinsurance case, and also because even if the evidence raised a fact issue the element was ómitted from the charge over Farmers' objection. For the reasons stated in section two, under *Haslip* and *Kraus* I believe there is no constitutional basis for exemplary damages. For the reasons stated in section three, I would reverse and remand for a new trial in which the jury is not deprived of all discretion to award no damages, or less than the amount of the underlying tort judgment, which cannot be collected from Soriano.

BUTTS, Justice, dissenting.

I join the dissent, agreeing with all three grounds for reversal set out in J. Peeples' dissenting opinion. The case should be reversed on the merits. There is no evidence to support a bad faith claim. The case should be reversed and rendered.

I would add simply as a suggestion that this is an underinsurance case, where the person who recovers for breach of good faith and fair dealing was the sole cause of the tragedy of the deaths and disabilities and, further, was the insured with *minimum* coverage (through no fault of the insurer). This is an appropriate case for our supreme court to look at the relationship of the insured and insurer as a "two-way street." This is a case where the covenant of good faith and fair dealing should apply to both the insurer and the insured. *See* Walker, *Comparative Bad Faith—Its Time Has Come In Texas*, 55 Tex.B.J. 792 (1992).

---

**16.** It makes no difference that Farmers' objections did not mention the words, "covenant not to execute." In its objection to issue nine, Farmers clearly complained that the court took all discretion from the jury: *"Defendant objects to special issue number 9 because the inquiry therein instructs the jury to award damages resulting from an excess judgment. The jury is not given the discretion of awarding an amount less than the excess judgment or zero.* It is in effect stating what sum of money, if now paid in cash, would fairly and reasonably compensate Richard Soriano for his damages by reason of a trial in Webb County, Texas. After that the Court instructs the jury to take into consideration the following elements of damages and none other. It specifically says the excess judgment taken against Farmers toward satisfaction of such judgment. *There, the Court is instructing the jury to award the judgment minus any amount of credit in that regard."* (emphasis added).